### STATE OF LOUISIANA * LINCOLN PARISH * 3RD JDC

**GB SCIENCES LOUISIANA LLC**

**FILED:**_____

Lincoln
Filed Oct 10, 2023 8:40 AM
Laura Barmore
Deputy Clerk of Court
E-File Received Oct 09, 2023 3:59 PM

C-63379
A

**Versus No.** _____

**AIRGAS USA LLC, ET AL.**

**CLERK:**_____

## PETITION FOR TRO, INJUNCTION, & ORDINARY CLAIMS FOR DAMAGES

### Parties, Jurisdiction, & Venue

**1.**   Plaintiff is GB Sciences Louisiana LLC ("GBSL"), a Louisiana-based limited liability company.

**2.**   Defendants are Airgas USA, LLC and Midsouth Airgas USA, LLC (collectively "Airgas"), limited liability companies doing business in the State of Louisiana.

**3.**   As a contract and tort action with acts/omissions, damages, and immovable property located in Ruston, Louisiana, venue and jurisdiction are proper.

### Facts

**4.**   Act 261 (2015) and Act 96 (2016) authorized the cultivation, extraction, processing, production, research, and use of medical marijuana in Louisiana. Per LSA-R.S. 40:1046, LSU AgCenter exercised its option to become one of two exclusive cultivation licensees. Following a competitive public bid process in 2017, LSU AgCenter selected GBSL as its public-private partner. Under an Agreement for Services with LSU AgCenter, GBSL provides the cultivation, extraction, processing, and production of medical marijuana products for wholesale distribution to the 10 licensed pharmacies authorized by the Louisiana Board of Pharmacy to dispense at retail medical marijuana products to qualified patients.

**5.**   On May 1, 2019, GBSL and Airgas entered into an Indoor Farming and Biomass Extraction Product Sale Agreement ("Airgas Agreement") whereby Airgas agreed to supply carbon dioxide that is crucial to GBSL's operations.[1]

**6.**   Section 2 of the Airgas Agreement states, in pertinent part:

> In the event of any change in state or federal law, regulation or enforcement that _materially and adversely affects the business operations of Buyer (GBSL) or the subject matter of this Agreement_, either party may elect to terminate this Agreement by providing the other party with at least thirty (30) days advance written notice of termination. (Emphasis added).

**7.**   Following the execution of the Airgas Agreement in 2019, GBSL began closely monitoring the effects on its medical marijuana business operations caused by Louisiana Act 344 (2020), Act 336 (2021) and Act 498 (2022).

**8.**   Parallel to the strictly regulated medical marijuana program under which GBSL manufactures and wholesales tetrahydrocannabinol (THC) products to the 10 licensed pharmacies authorized by the Louisiana Board of Pharmacy, the foregoing

---

[1] See, Ex.1–Airgas Agreement, annexed hereto and incorporated herein by reference. Notably, the Airgas Agreement was drafted and used by Airgas as one of its standard form contracts.

**EXHIBIT**
**A**

Page 1 of 7

Louisiana changes in law created a directly competing deregulated adult-use consumable hemp THC marketplace in Louisiana with the proliferation and sale to anyone over the age of 21 of over-the-counter psychoactive THC products without the need for a medical recommendation.

9.      GBSL closely monitored these progressive changes in law that materially and adversely affected its business operations. Indeed, these changes in law forced significant changes in how GBSL operates its business, which resulted in GBSL's need to terminate the Airgas Agreement.

10.     As a result of the changes in law that have and are continuing to materially and adversely affect GBSL's business operations, on July 3, 2023, GBSL sent advance written notice of termination of the Airgas Agreement to Airgas pursuant to §§2 and 24 of the Airgas Agreement. [2]

11.     Per the thirty (30) day advance notice of termination requirement in the Airgas Agreement, the Airgas Agreement terminated effective August 2, 2023.

12.     The decision to terminate the Airgas Agreement was not taken lightly by GBSL and GBSL avoided acting in haste by closely monitoring how the progressive changes in law over the years are adversely affecting its business operations and by exhausting its options to mitigate the damage caused by the changes in law.

13.     After the expiration of the 30-day period and termination of the Airgas Agreement effective August 2, 2023, Airgas belatedly responded on August 24, 2023, to GBSL's July 3, 2023 advance written notice of termination by stating "*We accept and acknowledge your notice of termination*..." [3]

14.     Notwithstanding Airgas' written admission of receipt, acceptance, and acknowledgment of GBSL's notice of termination of the Airgas Agreement and several conversations between GBSL and Airgas, Airgas refused to remove its equipment from GBSL's facilities and demanded an explanation of the change in law that is materially and adversely affecting GBSL's business operations.

15.     On September 11, 2023, GBSL responded to Airgas' demand for additional information by outlining in detail the evolution of Louisiana's Adult Use Hemp Product Law (2018-2023), the status of Louisiana's Adult Use Hemp market and its material and adverse impact on GBSL's business operations, GBSL's attempts to mitigate the material and adverse impacts of the changes in law, and the notice of termination of the Airgas Agreement. [4]

16.     After receiving GBSL's September 11, 2023 letter and conducting several more unproductive conversations, Airgas has continued to refuse to remove its equipment

---

[2] See, Ex.2–GBSL Termination Notice, annexed hereto and incorporated herein by reference.

[3] See, Ex.3–Airgas Acknowledgment & Acceptance, annexed hereto and incorporated herein by reference.

[4] See, Ex.4–GBSL Response, annexed hereto and incorporated herein by reference.

from GBSL's facilities. Worse, Airgas is also now interfering with GBSL's business operations with a separate and unrelated third-party supplier, as detailed below. [5]

17.     After terminating the Airgas Agreement effective August 2, 2023, GBSL and a new supplier – Matheson Tri-Gas, Inc. ("Matheson") – signed a Product Supply Agreement-Bulk ("Matheson Agreement") on August 22, 2023, to buy and sell the carbon dioxide that is so vital to GBSL's operations and have developed a solid working relationship for the supply of products and services. [6]

18.     Unfortunately, on October 5, 2023, Airgas sent GBSL another bad-faith letter acknowledging GBSL's notice of termination of the Airgas Agreement while ignoring the clear and unambiguous termination language in the Airgas Agreement, made threats against GBSL (and Matheson), and again refused to remove its equipment from GBSL's property. [7]

19.     Airgas has intentionally and negligently persisted in further damaging GBSL's business operations by failing to remove its equipment from GBSL's facility and effectively preventing Matheson from supplying carbon dioxide and other critically necessary products and services under the Matheson Agreement.

20.     To clarify, Matheson cannot provide carbon dioxide into containers owned by Airgas – it needs to install its own equipment before the carbon dioxide can be delivered. In other words, until Airgas removes its equipment – which it is contractually obligated to do per the Airgas Agreement – Matheson is handcuffed, putting the entirety of GBSL's commercial livelihood in jeopardy.

## Claims

21.     **TRO**.                    A temporary restraining order should be granted in order to prohibit Airgas from interfering with GBSL's business operations: this prohibition should include, but not be limited to, an order that Airgas refrain from threatening or interfering with the contractual relationship between GBSL and Matheson Tri Gas, Inc. Further, Airgas has had over 60 days to remove any and all of its equipment from GBSL's property. Time is now of the essence to avoid irreparable harm. Airgas must immediately remove its equipment from GBSL's property and discontinue impeding Matheson from satisfying Matheson's obligations to GBSL under the Matheson Agreement.

22.     **Injunction**.                    Injunctive relief in the form of a preliminary and permanent injunction is requested pursuant to LSA-C.C.P. arts. 3601, *et seq.*

---

[5] Per §9(c) of the Airgas Agreement, GBSL shall pay Airgas a removal fee for the removal of any of Airgas' equipment installed on GBSL's property. GBSL requested an equipment removal fee estimate from Airgas and has agreed to pay the appropriate removal fee, but Airgas has ignored this request. GBSL Farm has acted appropriately and within the wording in the Airgas Agreement.

[6] See, Ex.5–Matheson Agreement, annexed hereto and incorporated herein by reference. Carbon dioxide is vital to GBSL's cultivation operations because plants "breathe" carbon dioxide – oxygen is to humans as carbon dioxide is to plants.

[7] See, Ex.6–Airgas Response, annexed hereto and incorporated herein by reference.

(i) **Irreparable Harm**. Irreparable harm is met by a showing that the injuries are of a sort that monetary damages cannot adequately compensate and cannot be measured by pecuniary standards. LSA-C.C.P. art. 3609; *New Orleans Neighborhood Advisory Com v. Levy Gardens Partners 2008, LLC*, 20 So.3d 1131, 1135 (La.App. 4 Cir. 2009). Here, the longer Airgas refuses to remove its equipment from GBSL's property, GBSL is increasingly at risk of irreparable harm by placing GBSL's medical marijuana permit issued by the Louisiana Department of Health and the Agreement for Services with LSU AgCenter at risk. The intentional and negligent acts/omissions by Airgas against GBSL are violating and impeding GBSL's rights under RS 40:1046 and LAC Title 51 Part XXIX including, but not limited to, the right to cultivate, extract, process, produce, transport, and distribute medical marijuana, which will result in crop failure and disrupt the required reliable, adequate, and uninterrupted supply of medical marijuana products to patients. The loss of any such permit would be irreparable harm insofar as it would be a death nail to GBSL's right to conduct business in Louisiana's medical marijuana marketspace.

(ii) **Prohibitory Law**. More, where a violation of prohibitory law occurs, no irreparable harm is required to issue a temporary restraining order and preliminary injunctive relief; the party seeking to enjoin the behavior is entitled to the relief by law. S*ee, La. General Contractors, Inc. v. The Calcasieu Parish School Bd.* (La.1991); 586 So.2d 1354. See also, *Jurisich v. Jenkins* (La.1999); 749 So.2d 597, 599:

> Once a plaintiff has made a prima facie showing that the conduct to be enjoined is reprobated by law, the petitioner is entitled to injunctive relief without the necessity of showing that no other adequate legal remedy exists. (Emphasis added).

Examples of prohibitory laws being violated by Airgas include but are not limited to LSA-R.S. 40:1046 and LAC Title 51 Part XXIX.

(iii) **Bond**. Pursuant to LSA-C.C.P. art. 3610, some form of security is required for the purpose of "indemnifying the person wrongfully restrained or enjoined for the payment of costs and damages sustained." Here, GBSL's request does not jeopardize any potential or pending deal: it simply asks that Airgas be restrained from interfering with the existing contractual arrangement between GBSL and Matheson. Further, assuming this impending disaster can be stopped or minimized, GBSL is a solvent, profitable company so the risk of non-payment is minimal. Consequently, GBSL prays that a bond be fixed in the amount of *$2,500*.

23. **Penalties**. GBSL is strictly regulated in Louisiana by the Louisiana Department of Health pursuant to RS 40:1046 and LAC Title 51 Part

XXIX. GBSL is entitled to an award of civil penalties due to Airgas's acts and omissions which are jeopardizing GBSL's interest in Louisiana's medical marijuana marketplace – including Airgas's refusal to honor termination of the Airgas Agreement, refusal to remove its equipment, and interference with third-party vendors.

24.    **Contract**.                Airgas is actively and repeatedly breaching the Airgas Agreement in the following non-exclusive respects: (i) refusing to terminate pursuant to §2; and (ii) refusing to remove its equipment. But-for these breaches, Matheson would have moved on site and begun its supply of carbon dioxide on GBSL's Ruston farm location, causing serious pecuniary damages. Further, because Airgas's breaches are in bad faith, GBSL is entitled to all damages – foreseeable and unforeseeable – under LSA-C.C. Art. 1997 ("An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.").

25.    **LUTPA**.                Under the Louisiana Unfair trade Practices Act, LSA-R.S. 51:1401, Airgas's behavior outlined above constitute prohibited unfair trade practices insofar as they are immoral, unethical, oppressive, and offend public policies critical to both consumers and competitors in Louisiana. In addition to direct and principal damages, GBSL also prays for attorney fees and treble damages (*i.e.* 3x the principal damages caused).

26.    **Tortious Interference**.    Under the Airgas Agreement, GBSL has a legal protected interest in Airgas honoring its obligation to terminate (and remove all its equipment) when continuation would materially and adversely affect GBSL's business operations. Airgas has actual knowledge of the materially adverse effects of GBSL continuing operations with Airgas pursuant to the Airgas Agreement: but Airgas refuses to honor its obligations to terminate or remove equipment. Despite many opportunities and conversations, Airgas takes these illicit actions without justification in fact or law, directly causing both serious monetary damages and other irreparable harm. Consequently, Airgas is liable for tortious interference with contract, too.

27.    **Misrepresentation**. Airgas supplied false information (e.g. claiming that it still has a binding contract with GBSL) when it had a legal obligation to provide true, correct information (*e.g.* that the Airgas Agreement had terminated). Airgas breached its duty to provide true and correct information both by affirmative misrepresentations and failures to disclose/correct. Again, these misrepresentations have caused both serious monetary damages and other irreparable harm to GBSL. Consequently, Airgas is liable for negligent misrepresentation.

28.    **Fraud**.                Airgas misrepresented and suppressed the truth with the intention to both obtain an unjust advantage and cause loss and inconvenience. Specifically, Airgas claimed that it still had a binding contract under the Airgas Agreement with actual knowledge that the Airgas Agreement had been

terminated pursuant to the changes in law that are materially and adversely affecting GBSL's business operations. These affirmative misrepresentations and material omissions of fact (both to GBSL and third parties such as Matheson) have caused both serious monetary damages and other irreparable harm to GBSL. Consequently, Airgas is liable for fraud. Further, because **GBSL** is seeking confirmation of its termination – or "rescission" – of the Airgas Agreement, it is also entitled to attorney fees associated with its fraud claim. *See*, LSA-C.C. Art. 1958 ("The party against whom rescission is granted because of fraud is liable for damages and attorney fees.").

29.    Trespass.                Airgas' intentional refusal to remove its property from GBSL's Ruston location's premises constitutes trespass under Louisiana law insofar as Airgas is unlawfully and physically invading property owned by GBSL without GBSL's consent, causing damages as outlined above.

30.    Eviction.                Airgas is unlawfully occupying GBSL's Ruston farm with Airgas equipment (*e.g.* CO2 cylinders, containers, etc.). Accordingly, GBSL is entitled to – and hereby requests – an order of eviction under Louisiana law, demanding that Airgas promptly remove its equipment.

<u>Prayer</u>

Wherefore, GBSL prays for a TRO, preliminary injunction, and permanent injunction as outlined above and in the proposed order annexed hereto, reserving all claims for damages and attorney fees for an ordinary trial on the merits.

Respectfully submitted,

Russell A. Woodard, Jr. (34163)
Law Offices of Russell A. Woodard, Jr. LLC
119 Pelican Blvd., Ruston LA 71270
318.255.4898 * RAW@therawlaw.com

---

## GBSL AFFIDAVIT & ATTORNEY CERTIFICATION

1.    My name is John B. Davis and I am the President of GB Sciences Louisiana LLC ("GBSL"). I am duly authorized to make this attestation on behalf of GBSL, and everything stated herein and in the above petition is based upon my own personal knowledge arising in the regular and ordinary course of business. Specifically, I have read everything in the Petition for TRO, Preliminary Injunction, and Permanent Injunction, along with the exhibits referenced therein, and hereby certify that everything stated therein is true and accurate to the best of my knowledge, and that the exhibits annexed hereto are likewise true, accurate, and authentic. Done and signed by me before the undersigned notary on October 9, 2023.

John B. Davis                    Notary
                                 ANDREW C. COLE BAR Roll #38110

2.    My name is Russell Woodard, Jr. and, as counsel for GBSL pursuant to LSA-C.C.P. art. 3603, I hereby certify that notice obligations have been complied with to the extent practicable under these exigent circumstances. Undersigned emailed representatives of Airgas on October 6, 2023, to apprise them that these filings would be made unless Airgas provided immediate compliance with the demands stated therein. As of this filing, Airgas has made no known efforts to comply with GBSL's demands. Done and signed by me before the undersigned notary on October 9, 2023.

Russell A. Woodard, Jr.                    Notary #91759

## ORDER

Considering the "Petition for TRO, Injunction, & Ordinary Claims for Damages" filed by plaintiff GB Sciences Louisiana LLC ("GBSL") against defendants Airgas USA, LLC and Midsouth Airgas USA, LLC (collectively "Airgas"), it is hereby ORDERED as follows:

1. **TRO**.                    A temporary restraining order is hereby GRANTED. Airgas shall immediately remove its equipment from GBSL's property and refrain from interfering with the contractual relationship between GBSL and Matheson Tri Gas, Inc. It is further ordered that Bond is hereby set in the amount of **$2,500**.

2. **Preliminary Injunction**.   A hearing is hereby set for November ____ 2023 @ ____:_____ in courtroom #_____ of the Lincoln Parish Courthouse, whereby Airgas is to appear and show cause as to why GBSL's request for a preliminary injunction should not be granted.

3. **Reservation**.              All rights to any ordinary claims for damages held by GBSL against Airgas – to the extent any exist – are expressly reserved.

Done and signed on October ____ 2023 in Ruston, Louisiana.

_____
**Honorable District Court Judge – 3rd JDC**

## SERVICE INSTRUCTIONS

Please serve the above petition, order, and exhibits annexed hereto via PERSONAL service to the following:

1. **Airgas USA, LLC**
   Agent: CT Corp. System
   Address: 3867 Plaza Tower Dr.

2. **Midsouth Airgas USA, LLC**
   Agent: CT Corp. System
   Address: 3867 Plaza Tower Dr.

Lincoln
Filed Oct 10, 2023 8:40 AM
Laura Barmore
Deputy Clerk of Court
E-File Received Oct 09, 2023 3:59 PM

C-63379
A



an Air Liquide company

# INDOOR FARMING AND BIOMASS EXTRACTION PRODUCT SALE AGREEMENT

Airgas USA, LLC, with offices at 25227 Grogans Mill Road, Ste 200, The Woodlands TX, 77380 ("Seller"), and GB Sciences Louisiana LLC, with offices at 18350 Petroleum Drive, Baton Rouge, LA 70809 ("Buyer"), for and in consideration of the mutual promises and covenants set forth herein and intending to be legally bound thereby, agree as follows:

1. **REQUIREMENTS:** (a) Buyer shall buy from Seller, and Seller shall sell to Buyer, Buyer's total present and future requirements of industrial, specialty, and/or medical gases, in gaseous and/or liquid form ("Product(s)"). Products shall be for Buyer's use at listed state and local law compliant location(s) and at any relocated, expanded, or new state and or locally-approved Buyer location(s) (collectively, "Buyer Locations"), in suitable containers including, without limitation, cylinders, liquid containers and/or bulk (including mini and micro bulk), and including on-site generation equipment, upon the terms and conditions set forth in this Agreement, including, without limitation, any rider, exhibit or amendment to this Agreement. The Products covered by this Agreement shall also include Buyer's requirements of (i) welding consumables and equipment, safety products and services, and related supplies as may be designated in any rider, exhibit or amendment hereto, and (ii) any products used by Buyer in substitution for any of the Products described herein. (b) The Products shall be for Buyer's own use in accordance with all applicable state and local laws and regulations, and not for resale. Buyer shall not transfill Products from any gas or liquid storage vessels or other equipment ("Equipment") or cylinders provided by Seller into other containers unless the parties execute a transfill addendum.

2. **TERM:** This Agreement shall be effective as of May 1, 2019 ("Effective Date"). The initial term shall be seven years ("Initial Term") measured from the latest of (a) the Effective Date, (b) the date of first delivery of Product by Seller hereunder to the last storage vessel installed at any Buyer Location, or (c) in the event Buyer is contractually bound and prohibited from buying Products under this Agreement by any prior agreement, the date of the earliest expiration or earlier termination of such prior agreement. Thereafter, this Agreement shall automatically renew for successive renewal terms (a "Renewal Term") equal in length to the Initial Term unless terminated at the end of (i) the Initial Term or (ii) any Renewal Term, as the case may be, upon not less than twelve months' prior written notice by either party, given in accordance with Section 22 herein. The Initial Term and any Renewal Terms shall be the "Term". If any ("Equipment") is modified, relocated, replaced, substituted or Seller provides additional Equipment to meet Buyer's gas requirements, then a new Term equal in length to the Initial Term shall commence upon the date of first delivery of Product into the modified, relocated, replacement, substituted or additional Equipment.

This Agreement is subject to the renewal of the Agreement for Services dated September 14, 2017, between the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College on behalf of the Louisiana State University Agricultural Center and Buyer. If the Agreement for Services is not renewed, this Agreement shall terminate immediately upon the expiration of the Agreement for Services. Additionally, in the event of any change in state or federal law, regulation, or enforcement that materially and adversely affects the business operations of Buyer or the subject matter of this Agreement, either party may elect to terminate this Agreement by providing the other party with at least thirty (30) days advance written notice of termination.

3. **PRICING AND PAYMENT TERMS:** The Product prices, Rental Fees and Facility Fees (which are referred to individually and collectively as the "Price(s)") and related charges ("Charges") are set forth on riders to this Agreement and Exhibit 1. Buyer shall make payment in full by cash, check, wire transfer or CTX formatted ACH by the thirtieth day following the date of invoice. Continued open account credit is subject to Seller's assessment of Buyer's financial condition and ability to pay. In the event Buyer fails to make any payment when and as due, Seller may, at Seller's option, exercise any one or more of the following (in addition to any other remedies available to Seller): (a) cease all Product deliveries; (b) require Buyer, as a condition of receiving deliveries, to prepay for such deliveries and pay past due amounts as specified by Seller; (c) collect from Buyer on any delinquent balance a charge at the rate of one and one-half percent per month or, if less, the maximum rate permitted by law; and/or (d) remove any Equipment, cylinders and/or other containers provided by Seller and terminate, in whole or in part, this Agreement.

4. **RENTAL/FACILITY FEES:** Seller shall maintain records of cylinder deliveries and returns hereunder and shall charge Buyer rental at the rates in the attached rider ("Rental Fee"). In the event that any Equipment is installed by Seller or its representative at Buyer's facility for storage of Product, Buyer shall pay to Seller, for the availability of said Equipment for use hereunder, a fee computed by Seller for each item of Equipment so installed ("Facility Fee").

5. **CYLINDER RETURN:** Buyer shall return, in a good and non-contaminated condition, all cylinders, with valves closed, complete with caps and fittings and shall pay Seller the replacement value of any contaminated, lost or damaged cylinders, caps or fittings. Buyer shall not permit cylinders or other storage containers furnished hereunder to be filled with any product not furnished by Seller.

6. **BULK SITE REQUIREMENTS; ACCESS:** Buyer shall promptly furnish an accessible, secure location ("Site") for Seller's Equipment at each of its facilities at which Products are required to enable suitable delivery and storage of such Products, including all foundations, including, lighting, fences, pipes and other preparation and equipment required for the safe delivery and distribution of Product(s) to and from the Site. Buyer shall also provide at the Site, at Buyer's cost, all electricity or other utilities, including, if necessary, phone lines, as well as all state and local licenses and permits required in connection with use of the Site. Buyer shall begin to pay Facility Fees in the event that Buyer is unable to provide the Site within thirty days after Seller notifies Buyer that Equipment is ready for installation. Subject to applicable laws and regulations, authorized representatives of Buyer, Seller and/or Seller's representatives shall have access at all times to the Site, but Buyer shall deny access to all others.

7. **INSTALLATION:** Equipment provided by Seller shall be installed and maintained in good repair and operation by Seller. Buyer may provide its own equipment in which event Seller shall have no obligation to maintain the same. Buyer shall have no ownership interest in the Equipment installed at the Site by Seller and shall keep same free of any and all liens or claims of any kind. Seller may execute and record in the name of both parties UCC statements evidencing Seller's ownership of the Equipment. Buyer will pay any applicable UCC statement filing charge. Buyer shall pay Seller's freight charges for delivery of the Equipment to Buyer's Location, and Seller's crane and rigging costs associated with the Equipment installation. Buyer shall be responsible and liable for payment of, or, if Seller makes payment, shall reimburse Seller for, all costs arising out of Site conditions requiring additional labor or other costs. Buyer shall maintain adequate fire and extended coverage insurance on the Equipment, with loss payable to Seller. Buyer shall not alter, adjust or repair any Equipment installed by Seller at the Site. Buyer shall be responsible for any loss of, or damage to, such Equipment unless arising as a direct result of Seller's sole negligence. Seller shall not be liable for any delay in installation of any Equipment. Except as provided in Section 15, Buyer shall not permit Equipment furnished hereunder to be filled with any product not furnished by Seller. Buyer shall reimburse Seller for labor, parts and materials as the result of any service call made by Seller or Seller's representative, except for the standard preventative maintenance service as defined by Seller's standard maintenance guidelines.

AIRGAS INDOOR FARMING AND BIOMASS EXTRACTION REVISED PSA
REVISED 1-21-2019
Page 1 of 4

Airgas • 259 Radnor Chester Road, Suite 100, Radnor, PA 19087 • 866-935-3370
www.airgas.com

CONFIDENTIAL

Ex. 1-Airgas Agreement

8.  EQUIPMENT CHANGE: If in the sole judgment of Seller any Equipment installed by Seller shall become inadequate, including, without limitation, because of a substantial change in Buyer's requirements of Product, Seller shall have the right to substitute a different size or type of Equipment. The Facility Fee shall be appropriately adjusted by Seller to account for the substitution and Seller will provide written notice to Buyer of the new Facility Fee. This Agreement will cover all mode changes, including but not limited to: cylinders to liquid containers, liquid containers to bulk storage vessels, bulk storage vessels to on-site generation, or any combination of the preceding.

9.  REMOVAL: (a) Seller shall have the right to remove any Equipment installed by it within ninety days after the expiration or termination of this Agreement. Seller shall also have the right to immediately remove any Equipment installed by it and/or Seller's Equipment if Buyer receives any notice of forfeiture or enforcement action by governmental agencies regarding Buyer's Site or any of Buyer's personal property. Buyer's obligation with respect to loss of, or damage to Equipment, including any forfeited Equipment, shall remain in full force and effect until Seller effects such removal. (b) Buyer may request Seller to remove any of its Equipment from the Site prior to the end of the Term by making a written request to Seller for Equipment removal and paying to Seller, upon the issuance of an invoice, (i) a pro-rata share of Seller's cost of Installing such Equipment which reflects the balance of the Term of this Agreement that is unexpired as of the date of such removal and (ii) the estimated costs associated with the removal of the Equipment and shipping costs to the closest service center of Seller (collectively, "Removal Fee"). Seller will reimburse Buyer for any estimated amounts paid over actual costs following completion of the removal and shipment. No such removal shall affect Buyer's obligation to purchase its requirements of Products from Seller. (c) At the end of the Term, Buyer shall pay a Removal Fee. If Buyer fails to pay the Removal Fee within terms, at Seller's option, this Agreement may be extended for a period of one year from the proposed termination date in the written notice ("Removal Term Extension"). If the Removal Fee is not paid within the Removal Term Extension, Seller shall have the option to extend this Agreement again as permitted in this Section.

10. DELIVERIES: (a) Bulk storage Sites shall be accessible for delivery twenty-four hours per day, seven days a week. (b) Seller or its representatives shall usually make deliveries of all other Product(s) on regular business days between the hours of 8:00 a.m. and 5:00 p.m. or at other hours upon agreement of the parties. Buyer shall pay all additional expenses incurred by Seller as a result of deliveries at other hours or any other special delivery. (c) Deliveries made during a strike or other labor disturbance affecting Buyer shall be at Seller's sole option. If Seller does deliver during a strike or labor disturbance, then, notwithstanding anything to the contrary contained in this Agreement, Buyer assumes the entire risk and agrees to indemnify Seller from and against all costs, damages and losses arising out of any such delivery. (d) Seller may refuse to deliver Product(s) to any Buyer Location if Seller reasonably believes that such Buyer Location is unsafe, unlicensed or unpermitted, subject to any enforcement action by governmental agencies, or that it otherwise violates any applicable law or regulation, and Seller shall not be liable for such refusal to deliver. (e) Title and risk of loss of the Products shall pass to Buyer, (i) in the case of bulk Products upon delivery into the storage vessel, and (ii) for all other Products upon delivery to Buyer's Location. (f) Buyer shall monitor Product levels and give Seller reasonable, advance notice of changes in Buyer's Product volume and/or patterns of use. (g) With respect to bulk Product sold hereunder, Seller may, at its sole option, but is not obligated to, make any delivery of less than seventy-five percent of the capacity of the storage vessel. If Buyer's actual volume decreases below eighty-five percent or increases above one hundred and twenty percent of the Buyer provided Estimated Monthly Volumes for three consecutive months, Seller may adjust the Price. (h) Deliveries of Product shall be measured by Seller using the method typically used by Seller for the type of delivery made.

11. WARRANTY: Seller warrants that, at the time of delivery, all gas Products furnished hereunder will comply with Compressed Gas Association (CGA) guidelines. Any other Products sold by Seller will conform to Seller's or manufacturer's standard specifications. Seller makes no warranty with respect to non-gas Products manufactured by others, but will, on request, to the extent permitted, pass on to Buyer any applicable manufacturer's warranty. Seller warrants that the services shall be performed in a good and workmanlike manner. SELLER SPECIFICALLY DISCLAIMS ANY OTHER EXPRESS OR IMPLIED STANDARDS, GUARANTEES, OR WARRANTIES, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT AND ANY WARRANTIES THAT MAY BE ALLEGED TO ARISE AS A RESULT OF CUSTOM OR USAGE. SELLER MAKES NO WARRANTIES OF ANY KIND FOR ANY TECHNICAL ADVICE PROVIDED BY SELLER TO BUYER AND ASSUMES NO OBLIGATION OR LIABILITY FOR ANY SUCH TECHNICAL ADVICE WITH REFERENCE TO THE USE OF PRODUCTS OR RESULTS WHICH MAY BE OBTAINED THEREFROM, AND ALL SUCH ADVICE IF GIVEN AND ACCEPTED IS AT BUYER'S SOLE RISK.

12. REMEDIES; LIMITATION OF LIABILITY: NEITHER SELLER NOR SELLER'S SUPPLIERS OF PRODUCTS ("SELLER'S SUPPLIERS") SHALL BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL AND/OR PUNITIVE DAMAGES. SELLER'S SOLE LIABILITY AND BUYER'S SOLE REMEDY FOR ANY DAMAGES, INCLUDING BUT NOT LIMITED TO DAMAGES RESULTING FROM PRODUCTS, DELIVERY OF NON-CONFORMING PRODUCTS, SELLER'S FAILURE TO DELIVER SUCH PRODUCTS, INSTALLATION OR MAINTENANCE OF EQUIPMENT, EQUIPMENT MANUFACTURED BY SELLER, OR SERVICES PROVIDED BY SELLER SHALL BE LIMITED TO, AT SELLER'S OPTION, THE REFUND OF THE PURCHASE PRICE OR REPLACEMENT OF THE PRODUCT OR SERVICE IN QUESTION. THE LIMITATIONS CONTAINED IN THIS SECTION SHALL APPLY REGARDLESS OF WHETHER THE CLAIM FOR DAMAGES IS BASED ON BREACH OF CONTRACT, BREACH OF WARRANTY, TORT OR OTHERWISE, AND SHALL APPLY EVEN WHERE SUCH DAMAGES ARE CAUSED IN WHOLE OR IN PART, BY THE NEGLIGENCE, GROSS NEGLIGENCE OR ACTS AND OMISSIONS OF THE PARTY CLAIMING DAMAGES OR THE PARTY FROM WHOM DAMAGES ARE SOUGHT. ALL CLAIMS BY BUYER HAVING ANYTHING TO DO WITH THE SUBJECT MATTER OF THIS AGREEMENT SHALL BE MADE IN WRITING WITHIN NINETY FIVE DAYS AFTER THE EVENT GIVING RISE TO SUCH CLAIM AND FAILURE OF BUYER TO GIVE SUCH NOTICE SHALL CONSTITUTE A COMPLETE WAIVER BY BUYER OF ANY SUCH CLAIMS AND DEFENSE FOR SELLER AGAINST ANY SUCH CLAIMS. AS USED IN SECTIONS 12 AND 13, THE TERM "BUYER" AND "SELLER" SHALL INCLUDE NOT ONLY THE PARTY TO THIS AGREEMENT BUT ALSO ALL OF ITS AFFILIATES, AND THE TERM "BUYER" SHALL ADDITIONALLY INCLUDE ANY BUYER'S PARTIES, INCLUDING BUT NOT LIMITED TO, ANY THIRD PARTIES PAYING FOR PRODUCTS SUPPLIED UNDER THIS AGREEMENT. THE PROVISIONS GOVERNING REMEDIES, LIMITATIONS OF LIABILITY AND INDEMNITY SET FORTH IN THIS AGREEMENT SHALL SURVIVE EXPIRATION, TERMINATION, OR CANCELLATION OF THIS AGREEMENT.

13. INDEMNITY: BUYER SHALL INDEMNIFY, DEFEND, AND HOLD SELLER, ITS SUBSIDIARIES, AFFILIATES, SUCCESSORS, ASSIGNS AND INSURERS, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, AND EMPLOYEES, HARMLESS FROM AND AGAINST EVERY DEMAND, CLAIM, CAUSE OF ACTION, LOSS, LIABILITY, OR EXPENSE (INCLUDING LEGAL FEES AND COURT COSTS), FINES, PENALTIES (INCLUDING WITHOUT LIMITATION THOSE ASSESSED BY ANY GOVERNMENTAL AGENCY), ARISING OR ALLEGED TO ARISE IN CONNECTION WITH ANY OF BUYER'S OPERATIONS OR BUSINESS, INCLUDING BUT NOT LIMITED TO VIOLATION OF ANY APPLICABLE FEDERAL, STATE OR LOCAL LAWS OR REGULATIONS BY BUYER, OR ON ACCOUNT OF PERSONAL INJURY, ILLNESS OR DEATH, INCLUDING WITHOUT LIMITATION, INJURY, ILLNESS OR DEATH RESULTING FROM THE USE OF PRODUCT IN ANY APPLICATION, LOSS OF OR DAMAGE TO PROPERTY, OR FEES, FINES, PENALTIES, OR ASSESSMENTS ARISING OUT OF OR IN CONNECTION WITH THE USE, HANDLING, STORAGE, TRANSPORTATION, SALES, TRANSFER AND/OR DISPOSAL OF PRODUCT SUPPLIED BY SELLER HEREUNDER, REGARDLESS OF WHETHER CAUSED OR CONTRIBUTED TO, IN WHOLE OR IN PARTS, BY THE CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF SELLER, ITS EMPLOYEES, AGENTS OR SUBCONTRACTORS, (WHETHER PASSIVE OR ACTIVE), OR ARISING IN STRICT LIABILITY, TORT, CONTRACT OR OTHERWISE.

**Ex. 1-Airgas Agreement**

14. **INSURANCE:** Buyer shall, at its sole cost and expense, carry the following insurance coverage, on an occurrence basis, with the following minimum limits, at all times that Seller is providing Product to Buyer: a) Workers' Compensation – statutory limits; b) Employers Liability – $1,000,000 each accident; c) Comprehensive General Liability (including contractual liability, products/ completed operations) - $2,000,000 each occurrence and $2,000,000 general aggregate limit; d) Umbrella/Excess Liability - $2,000,000 each occurrence. Policies required herein shall be primary and non-contributory with respect to any insurance carried by Seller. The total limits of insurance required hereunder can be satisfied by any combination of primary and excess/umbrella liability insurance policies. An insurer's certificate of insurance coverage, as indicated above, with an endorsement requiring 30 days written notice to Seller prior to cancellation or material modification, will be submitted to Seller prior to the start of this Agreement. Such certificate will expressly state that "Airgas, Inc., and its respective employees, subsidiaries, affiliates, divisions, officers, directors, agents, and insurers are included as named additional insureds under all such insurance, except Workers' Compensation. Contractor further agrees to have its insurer waive its rights of subrogation against Airgas, Inc., and its respective employees, subsidiaries, affiliates, divisions, officers, directors, agents, and insurers." The insurance required under this Section 14 shall be in addition to Buyer's indemnification obligations under this Agreement.

15. **CUSTOM ORDERS/INVENTORY:** If Seller has ordered, manufactured or had manufactured for Buyer any custom or special order goods, including, by way of example only and not limitation, specialty gas blends or mixes, customized safety goods, or specialized Equipment, the expiration or early termination of this Agreement shall not relieve Buyer of its obligation to purchase and pay for all such goods.

16. **EXCUSE OF PERFORMANCE:** Seller shall not be liable for failure to perform if prevented by circumstances beyond its reasonable control, including any interference with Buyer's Site by any governmental agencies. If Seller is unable to supply Products to Buyer, then Buyer may obtain replacement products from other sources and place them in the Equipment (if any) or, in the case of all other Products, use them at Buyer's Location(s) for that period of time during which Seller is unable to supply Buyer. This right is subject to Seller's prior written consent, which shall not be unreasonably withheld. During this period Buyer shall ensure that Equipment is not damaged and shall compensate Seller if any damages occur and hold Seller harmless for damage or injury.

17. **ALLOCATION:** If sufficient Product is not available from Seller's normal source of supply for any reason, Seller may allocate Product among its own requirements and its customers. Seller will make reasonable efforts to obtain additional Product from other sources, provided Buyer shall pay all additional costs associated with such Product. Allocation in regard to this Section will completely satisfy and discharge Seller's supply obligations and Seller will, therefore, not be deemed to be in breach of such obligations.

18. **TAXES:** Prices are exclusive of any amount of federal, state and/or local excise, sales, use, property, retailer's occupation, gross receipts or similar taxes which may be imposed upon this transaction. Buyer shall pay all such taxes, including taxes on any Equipment, except Seller's income tax, either directly to the relevant taxing authority or as collected by Seller. In the event that Buyer claims exemption, full or partial, from such taxes, a properly completed exemption certificate with a list of the applicable exempt purchases, which will be acceptable to the appropriate taxing authorities, must be provided. Buyer will provide the applicable exemption certificate for each Buyer Location. Should such certificate be found invalid, Buyer agrees to bear the burden of any interest and penalties assessed.

19. **PRICE CHANGES:** (a) Seller shall have the right to revise any of the Prices up to five percent in a given calendar year for any one or more of the Products by written notice to Buyer. (b) In the event that Seller increases Prices by an amount greater than five percent in a given calendar year, such increase shall become effective fifteen days after written notice is given to Buyer. If within fifteen days of receiving such notice, Buyer furnishes Seller with a copy of a bona fide firm written offer to sell such Product of the same quantities, of the same quality under similar circumstances at prices lower than such revised Prices, Seller shall have fifteen days within which to, at Seller's sole option, either meet the lower price, exclusive of surcharges, hazmat or regulatory compliance fees, or revert to Seller's Price in effect before the price increase. If Seller agrees to meet such lower price, or reverts to Seller's Price in effect before the price increase, then Seller shall have the right, at its option, to extend the Term for a period of time equal to the Initial Term or the term of the competitive written offer. If Seller does not exercise its option to meet the competitive price or revert to Seller's previous Price, Buyer may terminate this Agreement as to the Product in question by giving Seller thirty days' written notice of such termination. (c) Buyer's rights under this Section shall not apply to any Price increase arising as a result in whole or part of compliance by Seller or its suppliers with federal, state, or municipal taxes, or government agency required audits or other regulations. (d) The adjustments in Sections 8, 10, 16 and Exhibit 1 are not subject to the Price Change provisions as outlined above.

20. **COMPLIANCE; SDS:** Buyer shall instruct its employees and agents to comply, and at all times Buyer shall comply, with all applicable federal, state and local statutes, regulations and laws regarding the safe handling, transportation, purchase and use of the Products, including without limitation all relevant reporting obligations under the Emergency Planning and Community Right-To-Know Act, the Occupational Safety and Health Act, and applicable regulations thereunder, and the Foreign Corrupt Practices Act of 1977, as well as any applicable licenses and consents required by such statutes, regulations, laws and regulations, which licenses and consents shall be obtained by Buyer. Buyer acknowledges and agrees that Seller has provided Buyer with all relevant Safety Data Sheets (SDS). Additional SDSs and copies are available: (i) at the local Airgas branch; (ii) by calling 919-368-8518; or (iii) by logging on to www.airgas.com/sds-search. Buyer understands that the Products must not be used without first consulting the SDS.

21. **BUYER'S RESPONSIBILITIES:** Products are sold on the condition that they be handled, used and disposed of in conformance with recognized industry and professional standards, including those related to the protection of human health and the environment. Buyer acknowledges that there are hazards associated with the use of the Products, that it understands such hazards, and that it is the responsibility of Buyer to warn and protect all those exposed to such hazards. It is Buyer's responsibility to ensure that: (i) the installation and/or use of the Products complies with all applicable laws, codes or regulations for the relevant jurisdiction; (ii) the Products are safe for the intended use; and (iii) the Products are handled in a safe and professional manner including the use of proper personal protective equipment and workplace warning and hazard signs; and (iv) Buyer premises has ventilation in conformance with all applicable fire codes, oxygen deficiency and carbon dioxide levels detection systems with audio and visual alarms, and Buyer has emergency response procedures. Buyer shall have the sole responsibility for determining the suitability of any of Seller's Products for the use contemplated by Buyer. After delivery of Products to Buyer pursuant to this Agreement, Buyer assumes all risk and liability arising out of the presence, storage, transport or use of the Products. Buyer represents and warrants that all employees are trained and supervised with respect to the safe use, handling, storage, and associated hazards of Product and the proper responses to warning signs and alarms. Buyer further warrants that (i) Buyer complies with all state and local laws and regulations applicable to Buyer's business; (ii) Buyer is duly licensed and/or permitted by its state and/or local governments to conduct Buyer's business. Buyer must obtain all building, installation, operational, and usage permits and licenses required by state and local agencies. Buyer acknowledges and agrees that Buyer has provided Seller with copies of its state and/or local permits and licenses prior to the Effective Date of this Agreement, and Buyer shall provide Seller with copies of such licenses/permits within ten days upon any changes, including but not limited to their renewal, as well as other documents related to the Buyer's operations upon Seller's request.

22. **TERMINATION BY SELLER:** Seller may terminate the Agreement upon written notice to the Buyer with or without cause. Buyer shall provide written notice to Seller within five days of any loss or non-renewal of its state and/or local licenses and/or permits. In the event Buyer fails to maintain or timely renew its state and/or local licenses and/or permits to conduct Buyer's business, Seller shall have the right to immediately terminate this Agreement without any resulting damage or obligation to Buyer. In the event Buyer receives any notice in any form whatsoever from any governmental agency regarding law enforcement action against Buyer or any of its principals or employees, Buyer's failure to comply with any laws applicable to Buyer's business, or asset forfeiture of its real or personal property, Buyer shall immediately provide Seller with a copy of such notice, and Seller shall have the right to immediately terminate the Agreement without any resulting damage or obligation to Buyer.

AIRGAS INDOOR FARMING AND BIOMASS EXTRACTION REVISED PSA
REVISED 1-21-2019
Page 3 of 4                          Airgas • 259 Radnor Chester Road, Suite 100, Radnor, PA 19087 • 805-935-3370                          CONFIDENTIAL
www.airgas.com

Ex. 1-Airgas Agreement

23. GOVERNING LAW; DISPUTE RESOLUTION; CLASS ACTION AND TRIAL BY JURY WAIVER: This Agreement shall be governed by and construed in accordance with the substantive law of the state of the Buyer's principal place of business, without regard to its conflict of laws principles. Prior to either party filing a lawsuit, except to prevent the running of any applicable statute of limitations, all disputes and claims regarding this Agreement shall be submitted to non-binding mediation. If the parties cannot agree on a mediator, one will be selected pursuant to American Arbitration Association rules. BOTH PARTIES HERETO HEREBY WAIVE ALL RIGHT OR ENTITLEMENT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE THAT ARISES OUT OF OR RELATES IN ANY WAY HERETO OR TO PRODUCT SUPPLIED HEREUNDER. Any Claim must be brought in the respective party's individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff, or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum.

24. NOTICES: Unless otherwise provided herein, all notices shall be in writing, addressed to the intended recipient at the address on the first page hereof or such other address as the recipient may provide, and given via the following methods: hand delivered, sent by overnight courier providing proof of delivery, or sent by email to an address provided by the recipient for such purpose, and shall be deemed to have been given on the date such notice is hand delivered or sent, as applicable. Notices of excuse of performance, allocation, adjustments to Prices or Charges (including any special charges) provided hereunder may also be sent by U.S. Mail and shall be deemed to have been given two business days after being deposited with the United States Postal Service, if sent by U.S. mail. Notwithstanding the foregoing, a notice of termination under Section 2 or 18 hereof must be given by certified mail or overnight courier providing proof of delivery.

25. MISCELLANEOUS: (a) Buyer represents that Buyer is contractually free to enter into this Agreement and to perform hereunder and shall indemnify and defend Seller against all damages Seller may suffer if Buyer's representation is not correct. (b) The invalidity or unenforceability of any provision of this Agreement under the laws of any state in which this Agreement is in effect shall not affect the validity or enforceability of any other provision of this Agreement. (c) Buyer shall not require waiver or release of any personal right or execution of any document that conflicts with this Agreement or provides for additional obligations of the parties from Seller's employees, subcontractors or representatives in connection with Seller's entry onto the premises of Buyer and Buyer agrees that no such release, waiver or document shall be binding, if executed by Seller's employee, subcontractor or representative. (d) The waiver by either party of any of its rights under this Agreement shall not be construed as constituting a precedent. (e) Buyer must receive Seller's consent to assign this Agreement. This Agreement shall inure to the benefit of Seller and Buyer and their respective successors and assigns. If Buyer transfers a material part of its assets and/or its operations at any Buyer Location or its stock to a third party, Buyer shall require the third party to accept an assignment of this Agreement, as it relates to any applicable Buyer Location or Product, in form and content acceptable to Seller. (f) This Agreement and materials marked "Confidential" will be kept confidential by Buyer. (g) Buyer represents and warrants that this Agreement has been duly and validly authorized, executed, and delivered. (h) This Agreement may be executed in counterparts, each of which shall be an original and both of which taken together shall constitute the same instrument. Transmission by facsimile, email or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart and legal, valid and binding execution by such party. (i) As a part of the consideration for this Agreement, the applicable provisions of Section 12 (Remedies; Limitation of Liability) shall extend to and be enforceable by and for the benefit of Seller's Suppliers. (j) This Agreement with any riders, exhibits and/or amendments represents the entire agreement between Seller and Buyer in relation to the sale of Products. Amendments to this Agreement shall be in writing and no acceptance by Seller of any purchase order, acknowledgment, or other document specifying different and/or additional terms or conditions shall be effective.

| GB SCIENCES LOUISIANA, LLC (Buyer) | AIRGAS USA, LLC (Seller) |
|---|---|
| Accepted By: | Submitted By: Cheryl C. Mauffray |
| Printed Name: John B. Davis | Accepted By: |
| Title: Authorized Representative  Date: President 5/1/2019 | Printed Name: Jared Favile  Title: Region Purchasing  Date: 5/30/19 |

Ex. 1-Airgas Agreement



July 3, 2023

Airgas USA, LLC                                      Mid-South Airgas USA, LLC
25227 Grogans Mill Road, Ste. 200                    31 North Peoria
The Woodlands, TX 77380                              Tulsa, OK 74120

     RE:   Notice of Termination
            Indoor Farming and Biomass Extraction Product Sale Agreement
            Airgas USA, LLC, and GB Sciences Louisiana LLC

To whom it may concern,

Please accept this letter as thirty (30) days advance notice of termination of the Indoor Farming and Biomass Extraction Product Sale Agreement between Airgas USA, LLC, and GB Sciences Louisiana, LLC, pursuant to §§2 and 24.

We have been closely monitoring the material and adverse effects on our medical marijuana business operations starting with the change in federal law when Congress passed the 2018 Agriculture Improvement Act that legalized the possession and cultivation of hemp followed by change in Louisiana law when the legislature passed Act 344 (2020), Act 336 (2021) and Act 498 (2022). Parallel to the strictly regulated medical marijuana program that manufactures and sells tetrahydrocannabinol (THC) products, these legislative changes created a directly competing deregulated adult-use consumable hemp marketplace in Louisiana with the proliferation and sale to anyone over the age of 21 of over-the-counter THC products containing 8mg THC per serving without the need for a medical recommendation.[1] We avoided acting in haste to terminate this Agreement by closely monitoring over the years how the progressive changes in law are adversely affecting our business operations. These changes in law have forced changes in how we operate our business, which resulted in our need to terminate this Agreement.

Thank you for your consideration and cooperation. This letter is not to be construed as a waiver or relinquishment of any other provisions, conditions, rights, remedies, or other grounds for termination of the Agreement.

Sincerely,

Anthony Cieslak
COO, GB Sciences Louisiana, LLC, dba Good Day Farm
425 West Capitol Ave.
14th Floor
Little Rock, AR 72201

---

[1] THC is the principal psychoactive constituent found in both hemp and (medical) marijuana, *i.e.*, the Cannabis *sativa* plant.

Good People. Good Cannabis. Good Day.

**Ex. 2 - GBSL Termination Notice**



an Air Liquide company

**Gary Forrest**
Vice President – Bulk Gases
Airgas USA, LLC. Mid South Region
31 North Peoria Ave.
Tulsa, OK  74120
214-316-2225
Gary.Forrest@airgas.com

August 24, 2023

GB Sciences Louisiana, LLC, dba Good Day Farm
Attn: Anthony Cieslak, COO
425 West Capitol Ave. 14th Floor
Little Rock, AR 72201

### Re: Cancellation Acknowledgement

Dear Mr. Cieslak,

Airgas has received your notice of termination dated July 3, 2023, referencing the Indoor Farming and Biomass Extraction Product Sale Agreement between our companies with an Effective date of May 1, 2019.

We would like to discuss this matter and any other issues that you may be having. Representatives from Airgas have been reaching out to your local office for several weeks by phone, in person, and by email with no response.

We accept and acknowledge your notice of termination; however, we find no reason to relinquish you from the Agreement as requested in your letter.

Pursuant to Section 1, you are obligated under the Agreement to purchase all industrial gas requirements from Airgas as long as there is a need for CO2 including "without limitation, cylinders, liquid containers and/or bulk (including mini and micro bulk), and including on-site generation equipment, upon the terms and conditions set forth in this Agreement."

The Agreement will remain in effect until the end of the Initial Term.  Based on the terms of our Agreement, the end of the Initial Term of the Agreement is **February 8, 2029** unless extended by some other provision in our Agreement.

We are committed to supporting the success of your business. I would appreciate a follow up discussion regarding this letter.  Please call me at (214) 316-2225 so that we can discuss this issue and the on-going relationship between Airgas and GB Sciences Louisiana.

Respectfully,

*Gary Forrest*
Vice President – Bulk Gases

**Ex. 3 - Airgas Acknowledgment & Acceptance**



**MATHESON**
The Gas Professionals

<u>PRODUCT SUPPLY AGREEMENT - BULK</u>

This Product Supply Agreement ("Agreement") is entered into by and between Matheson Tri-Gas, Inc. ("MTG") and GB Sciences Louisiana, LLC / Good Day Farms ("BUYER") as of 8/22/2023 (the "Effective Date"). All capitalized terms used but not defined in this Agreement shall have the definitions assigned thereto in the applicable Exhibit A hereto (as the same may be appended or amended by agreement of the parties hereto from time to time).

1.    SALE AND PURCHASE. During the Term, MTG agrees to sell to BUYER and BUYER agrees to purchase from MTG, all of BUYER's present and future requirements of the Product(s) listed in one or more Exhibits A hereto and all other gases (either in liquid or gaseous form), safety products and welding products in every form for use in connection with BUYER's operations now or hereafter conducted at the Consuming Location. If BUYER's operations are relocated or expanded at any other location while this Agreement is in effect then, at MTG's sole option, this Agreement shall apply to such other locations as well. BUYER's ability to manufacture or produce Product(s) itself shall not relieve BUYER from its obligation to purchase its requirements pursuant to this Agreement and BUYER shall not purchase any substitute for any Product(s) delivered by pipeline from any producing facility or equipment (whether on-site or off-site) or lease, purchase or otherwise acquire any facility or equipment that produces any Product(s) or substitute therefor (either in liquid or gaseous form) from any third party, other than as permitted in Section 8 below. BUYER agrees to purchase all Product(s) at the prices, charges and fees (aggregately, "Prices"), set forth in one or more Exhibits A hereto.

2.    TERM. This Agreement shall be effective as of the Effective Date. The initial term of this Agreement (as set forth in the applicable Exhibit A hereto) shall commence on the later of the Effective Date and the first day of the first month following the date of first delivery of Product(s) to the last System installed by MTG or storage vessel or system owned by BUYER (the "Initial Term"). This Agreement shall automatically renew for successive terms equal in length to the Initial Term (each a "Renewal Term"), unless notice of termination is received by either party not more than eighteen (18) months and not less than twelve (12) months (a) prior to the expiration of the Initial Term or each successive Renewal Term or (b) from the effective date of any amendment to this Agreement or any Exhibit A hereto. (When used herein, "Term" shall be deemed to include Initial Term and any Renewal Term, as applicable.)

3.    DELIVERIES. As to both parties' performance under this Agreement, time is of the essence.
(a) Upon completion of initial delivery of Product(s), BUYER shall be deemed to have accepted the installation of the applicable System(s). MTG may, in its sole discretion, make deliveries of Product(s) in a quantity less than seventy five percent (75%) of the capacity of any single System or in excess of one hundred ten percent (110%) of BUYER's Estimated Monthly Volume ("Nonstandard Deliveries"). If BUYER continues to request Nonstandard Deliveries for a period of ninety (90) consecutive days or more, MTG shall be permitted to increase Prices. Additionally, should MTG elect to make Nonstandard Deliveries, BUYER shall reimburse MTG for any and all other documented and reasonable expenses or costs that MTG may incur; (b) MTG may refuse to deliver Product(s) to the Consuming Location if MTG reasonably believes that the Consuming Location itself, the area surrounding the System, the access way to the System, or the condition of BUYER's storage vessel or system is unsatisfactory, unsafe or violates MTG's safety protocols or any applicable law or regulation at any time during the Term of this Agreement. MTG shall advise BUYER of the reasons for nondelivery as soon as reasonably practical and may condition future deliveries of Product(s) to completion of corrective action by BUYER, to the reasonable satisfaction of MTG; (c) All Product(s) shall be delivered F.O.B. MTG's delivery vehicle or MTG's production facility if MTG's delivery vehicle is not used, and title and risk of loss or damage as to Product(s) shall pass to BUYER at such time; (d) MTG shall have the right to install telemetry systems with the System(s). It shall be solely BUYER's responsibility to monitor its inventory of Product(s), regardless of whether MTG installs a telemetry system for measuring the Product(s) inventory in the System(s); (e) BUYER will allow MTG to make deliveries twenty-four (24) hours per day, seven (7) days per week. In the event BUYER requires deliveries on a more restrictive basis, causes frequent delivery delays, requests the delivery of Product(s) upon less than forty-eight (48) hours prior written notice or otherwise changes the terms of MTG's access to the System(s), then BUYER will reimburse MTG for any additional costs incurred by MTG; and (f) If BUYER continues to request and/or accept deliveries of Product(s) after the expiration of the Term, then, in MTG's sole and absolute discretion, any nonrenewal notice shall be deemed rescinded and void and a new Renewal Term shall commence as of the expiration date of the then applicable Term.

4.    BULK STORAGE SYSTEM.
(a)    MTG shall: (1) Deliver at the Consuming Location(s), at BUYER's sole expense, a bulk storage system or systems including any safety and control apparatus, telemetry systems, low-temperature devices and vaporization equipment associated therewith that MTG determines are reasonably adequate to meet BUYER's Estimated Monthly Volume (the "System(s)"). "System" shall include all of the foregoing equipment, safety and control apparatus and other devices and systems up to but excluding the point of connection with BUYER's piping but shall not include any storage vessel or system owned by BUYER; (2) Install such System(s) upon concrete foundation(s) or other improved area(s) in the Consuming Location(s) acceptable to MTG and connect said System(s) to piping installed by BUYER; (3) Maintain and repair said System(s) according to MTG's standard practices and carry out, at BUYER's expense, an annual safety inspection of each System. If MTG has agreed to deliver Product(s) to a bulk storage system owned by BUYER, MTG may, at BUYER's request and expense, maintain and/or perform safety inspections upon such bulk storage system; (4)In connection with the maintenance and repair of the System(s), shut down the System(s) (whether scheduled in advance and notified to BUYER or not) or remove said System(s) from the Consuming Location(s) and substitute it for a System(s) of appropriate type and size if, in the sole opinion of MTG, the System(s) require(s) maintenance or repairs that cannot be performed in a safe and/or practical manner at the Consuming Location(s). MTG may also replace or substitute the System(s) if BUYER's monthly consumption of Product(s) changes significantly; and (5) On or before the initial delivery of the Product(s), make available to BUYER copies of such Safety Data Sheets ("SDS") as required by law, and provide electronic copies upon BUYER'S request.
(b)    BUYER shall, at BUYER's sole cost and expense: (1) Provide and maintain at all times a clean and safe site at the Consuming Location(s), on conditions acceptable to MTG. Provide a concrete foundation(s) or other improved area(s) reasonably acceptable to MTG

Scanned with CamScanner

that meets all applicable federal, state and local requirements for placement and installation of the System(s) and delivery and storage of the Product(s). Such site shall be free from overhead and underground obstacles; (2) Provide fencing and security around the System(s) and prevent any person not expressly authorized by MTG from tampering with, repairing, moving or accessing the System(s). BUYER shall provide and/or reimburse MTG for the costs and expenses of any certificates, permits, governmental or insurance company annual inspection fees for the System(s). System(s) shall remain in the sole and exclusive possession of BUYER for the Term, unless removed by MTG as specified in Section 4(a) above; (3) Install and maintain in good condition all piping, connections and apparatus necessary for distribution of Product(s) from the System(s), complying with the technical specifications set forth in Exhibit A; (4) Furnish and pay for lighting, water, telephone lines, power and steam and other applicable utilities as required for the System(s). BUYER shall reimburse MTG for any additional costs (including engineering costs) required to design, certify, or make changes to any existing or new concrete foundation(s) for the installation and placement of the System(s); (5) On or prior to delivery and installation of the System(s), BUYER shall deliver to MTG an easement, waiver of rights in the System(s) or such other documentation as may be necessary, from BUYER or, if BUYER is not the owner of the Consuming Location(s), from the owner of the Consuming Location(s), acknowledging MTG's ownership in the System(s) and granting to MTG and MTG's representatives unfettered entrance to the Consuming Location(s) and access the System(s) at all times for the Term; (6) On or prior to delivery and installation of the System(s) and on each anniversary of the Effective Date during the Term, BUYER shall deliver to MTG a copy of the commercial liability insurance policy (or renewal thereof if applicable) for the Consuming Location(s) identifying MTG as an additional insured; (7) Notify MTG immediately of any unsafe or irregular condition or occurrence involving the System(s), including any damage to, malfunction of or changes in the System(s). BUYER shall not, and shall not allow any third party to, tamper with, maintain, modify or repair the System(s) without the prior written consent of MTG; (8) Provide an access roadway and area adjacent to all System(s) acceptable to MTG to facilitate delivery of Product(s) and the parking of MTG's delivery vehicles. If the Product is an oxidizer, the aforementioned hard-surface parking area must be constructed of concrete; (9) Prohibit the use or storage of oil, grease or lubricants or any hazardous, flammable or combustible materials in, on or near the System(s) and/or the concrete foundation on which the System(s) is located or the Product(s) is delivered; (10) Comply with all applicable laws, regulations, rules and ordinances applicable to the Consuming Location(s) related to the System(s), the delivery by MTG of Product(s) and BUYER's use and storage of the Product(s) and System(s) including, but not limited to, zoning, licensing, permitting and all applicable environmental, health and safety laws and regulations, including but not limited to (i) relevant reporting obligations under the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. §§11001-11049 (EPCRA, also commonly known as Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA Title III)), or reporting obligations under other laws or regulations, resulting from the presence, use or accidental release of the Product(s) supplied under this Agreement, and (ii) the Occupational Health Act of 1970 and the implementing regulations of the Occupational, Safety and Health Agency, and State equivalents, including but not limited to the Hazard Communication Standard; (11) Reimburse MTG at MTG's then-prevailing rates for the cost of any temporary System(s) used during the installation, modification, repair and/or relocation of the System(s); (12) Pay to MTG its costs to (i) deliver and remove the System(s) to/from the Consuming Location(s) from/to the point of storage or manufacture, as the case may be; (ii) inspect the System(s) as required by applicable law; and (iii) provide labor, parts, and materials for any service call made by MTG for any reason except for routine maintenance performed upon System(s) by MTG; (13) To the extent required under applicable environmental, health and safety laws and regulations, BUYER will, among other things, develop and implement a written chemical hazard communications program for BUYER's employees with respect to the Product(s). BUYER will not use the Product(s) without first consulting the SDS. BUYER shall provide all persons who might become exposed to the Product(s) with copies of the SDS and such other training and precautionary measures as necessary, including at a minimum those required by applicable laws and regulations, to avoid any damage or injury.

(c) Notwithstanding the manner in which the System(s) may be affixed to any real property, the System(s) shall be deemed to be personal property of MTG and not a fixture. BUYER shall not suffer or allow said System(s) to become subject to any lien, claim or encumbrance, and shall promptly cause any such lien, claim or encumbrance to be released. BUYER shall not remove any labels or evidence of ownership affixed to the System(s). Title to all System(s) shall at all times remain with MTG and, upon termination of this Agreement at the end of the Term or otherwise, MTG may, subject to Section 5(b) of this Agreement, remove the System(s), at BUYER's expense, without notice or consent. To the extent any refurbishment to the System(s) is required in order to redeploy the System(s), BUYER shall pay to MTG a refurbishment fee not to exceed fifteen percent (15%) of the total Monthly Service Charges due during the applicable Term for such System(s). BUYER hereby authorizes MTG to execute and file any security and/or title documents as may be necessary or advisable to evidence MTG's title to the System(s), including filing UCC financing statements regarding such System(s), and shall reimburse MTG for all such expense.

(d) If, in MTG's or BUYER's opinion, additions and/or modifications to the System(s) are required or the System should be relocated (whether due to changes in BUYER's methods or locations of use, changes in the accessibility to the System(s), changes to MTG's or BUYER's internal safety protocols or changes required by law) MTG may make such addition, modification and/or relocation as MTG deems reasonably necessary, at BUYER's expense. In such an event, the Service Charge may be increased or decreased in accordance with MTG's then-prevailing prices and rates for such additional or different System(s) and a new Renewal Term shall begin from the date such addition, modification and/or relocation is completed. BUYER agrees that the minimum size System(s) to be installed by MTG shall be capable of storing a six (6) week supply of Product or enough Product to support two (2) days of continuous consumption by BUYER, whichever is greater, based upon either BUYER's Estimated Monthly Volume or its applicable Product consumption during the prior six (6) months.

(e) IT IS EXPRESSLY AGREED THAT, UNTIL THE SYSTEM(S) ARE RETURNED TO MTG, ALL RISK OF LOSS OR DAMAGE TO THE SYSTEM(S) IS HEREBY ASSUMED AND SHALL BE BORNE BY BUYER (REGARDLESS OF THE CAUSE OR ANY DEGREE OF NEGLIGENCE BY MTG OR FOR BREACH OF WARRANTY OR CONTRACT OR FOR STRICT LIABILITY) UNLESS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF MTG. FOR SYSTEM(S) DAMAGED BEYOND REPAIR, BUYER SHALL PAY TO MTG, ON DEMAND, THE FULL REPLACEMENT VALUE OF THE SYSTEM(S) AT MTG'S THEN-PREVAILING PRICES AND RATES. FOR DAMAGE TO SYSTEM(S) THAT MTG IS ABLE TO REPAIR, BUYER SHALL PAY MTG THE ACTUAL COSTS OF THE REPAIRS. BUYER SHALL MAINTAIN ADEQUATE FIRE AND EXTENDED INSURANCE COVERAGE FOR THE BENEFIT OF MTG COVERING SUCH SYSTEM(S) AND SHALL PROMPTLY PROVIDE EVIDENCE THEREOF (INCLUDING EACH ANNUAL RENEWAL) TO MTG.

2

Scanned with CamScanner

(f) If BUYER's requirements for Product(s) cease to exist prior to the expiration of the Term for any reason, BUYER will reimburse MTG for the costs of removing the System(s). However, unless otherwise agreed by the parties in writing, the removal of any or all of MTG's System(s) shall not be deemed to be a termination or rescission of this Agreement.

(g) In the event that BUYER requests that MTG deliver Product(s) to BUYER's bulk storage system, BUYER shall be solely liable for the maintenance of such storage system, provide adequate training to MTG's delivery personnel regarding such storage system, indemnify and defend MTG for any and all claims arising as a result of MTG's delivery of Product(s) into such storage system and otherwise comply with the applicable requirements of Section 4(b) regarding such storage system.

5. REVISION OF PRICES; PAYMENT.

The Monthly Service Charge shall commence on the first date specified in Exhibit A.

(a) From time to time MTG shall have the right to revise the Price(s). Any such Price revisions shall be reflected in the immediately succeeding monthly invoice. To the extent any such Product Price revision will be in excess of five percent (5%) of the then-applicable Price, MTG shall notify BUYER in writing of such revision and BUYER may, within fifteen (15) days after the date of said notice, furnish MTG with a Competing Bid. For purposes of this Section 5(a), a "Competing Bid" is copy of a bona fide firm written offer from a reputable producer of the applicable Product(s) offering to sell BUYER the applicable Product(s) in like quantities, like quality, under similar terms and conditions and at a lower Product Price. If, within twenty (20) days from receipt of the Competing Bid, MTG shall not agree to either (i) match the pricing in the Competing Bid, or (ii) withdraw the applicable Product Price revision, whichever is higher, BUYER shall have the right to terminate this Agreement with respect to the applicable Product(s). In such case, BUYER shall, within thirty (30) days thereafter, give MTG notice of termination of this Agreement. Such termination date shall be effective no sooner than sixty (60) days after the termination notice; provided, however, that if MTG notifies BUYER in writing that it will match the Competing Bid or withdraw the applicable Product Price revision, whichever is higher, by the later of twenty (20) days from MTG's receipt of the Competing Bid or five (5) business days from MTG's receipt of the termination notice, MTG shall have the right to extend the Term by the term provided in such Competing Bid or the Renewal Term, whichever is greater.

(b) In the event that MTG makes available but BUYER fails to take delivery of at least the Minimum Monthly Purchase Amount ("MMPA") set forth on the applicable Exhibit A hereto during any month of the Term (the "MMPA Shortfall"), MTG may invoice BUYER for the amount of Product associated with the MMPA Shortfall at the current Price. Any MMPA Shortfall so invoiced by MTG shall be included in the invoice in the month following the occurrence of the MMPA Shortfall and shall be paid by BUYER in accordance with this Agreement. The MMPA shall be prorated for any partial month. If there is an MMPA Shortfall for three (3) or more consecutive months, at the request of the MTG or the BUYER, the parties shall meet in good faith to negotiate an adjustment to the MMPA and the Price for the remainder of the Term.

(c) All payments due to MTG hereunder shall be made to MTG at the location or the bank account indicated on MTG's invoice without set-off or withholding. All invoices shall be due and payable by BUYER within ten (10) days from the date of invoice (or upon demand if reasonably deemed necessary by MTG), and such invoices shall be conclusively presumed to be correct unless BUYER objects to any charges therein within thirty (30) days of the date of invoice. Notwithstanding any notice of termination delivered by BUYER in accordance with Section 2 above, this Agreement shall be deemed renewed for an additional Renewal Term if any amount due, including estimated removal costs and fees of any System(s) (which shall be billed 30 days prior to any such removal), is not paid in full on or before the termination date. Upon completion of the removal and shipment of the System(s), MTG will reimburse BUYER for any positive difference between the estimated removal costs paid by BUYER and the actual costs incurred by MTG. To the extent the BUYER does not make payments by wire transfer, MTG reserves the right to charge administrative fees associated with any other payment method where applicable. MTG reserves the right to add a monthly service charge of eighteen percent (18%) per annum to any delinquent balance. BUYER agrees to report and to pay any and all taxes upon the sale, delivery, storage, lease, rental and/or use of the Product(s) and System(s) including, but not limited to, real or personal property taxes along with any excise tax imposed upon MTG as a result of its performance under this Agreement.

(d) From time to time MTG may need to recover for unusual or unexpected cost increases including, but not limited to, the costs of complying with federal, state and local laws and regulations involving the storage, transportation, handling and/or disposal of hazardous materials, energy and/or fuel price changes, loss of local production facilities, raw material or commodity supply dislocations, and other similar events ("Surcharges"). The amount of the Surcharge may not be specifically related to actual costs incurred by MTG and may vary by the type of Product(s), System(s), service, geographic location or time. Surcharges, unless otherwise specified, shall not include federal, state or local taxes nor be required by any federal, state or local agency or authority. All Surcharges shall be invoiced by MTG and paid by BUYER in accordance with this Agreement.

6. NOTICES. (a) Any notices sent pursuant to Sections 4(b)(6), 5(a) (other than notices of termination by BUYER), 5(c) or 8 shall be sent by electronic mail transmission from the respective sender's electronic mail address and to the respective receiver's electronic mail addresses set forth in the applicable Exhibit A hereto. Such notices shall be deemed effective upon receipt. (b) Any notices sent pursuant to Sections 2, 5(a) (as to only a notice of termination from BUYER), 7(b)(i) or 7(c) shall be sent by certified mail, return receipt requested, or overnight messenger from an internationally recognized courier, to the applicable recipient's address set forth in the applicable Exhibit A hereto. Such notices shall be deemed effective upon confirmed receipt or refusal to accept delivery. (c) Each party covenants that it shall advise the other in writing if its mailing address and/or electronic mail address for notices changes during the Term of this Agreement.

7. DEFAULT AND REMEDIES.

(a) Any of the following shall be considered a "Default": (i) BUYER commits a breach of any of its representations, duties or obligations arising under this Agreement, (ii) a petition is brought by or against BUYER under any bankruptcy or insolvency laws seeking any reorganization, arrangement, liquidation, dissolution or similar relief with respect to BUYER or BUYER shall make an assignment for the benefit of creditors or if a receiver is appointed for BUYER, or (iii) if, in the opinion of MTG, BUYER's credit has become impaired and BUYER does not, within 5 business days' notice by MTG, deliver credit support in an amount and on terms and conditions reasonably acceptable to MTG.

(b) If a Default has occurred and is continuing, MTG may exercise any or all of the following remedies without notice or leave of court: (i) terminate this Agreement upon two (2) business days' notice, (ii) remove the System(s) from the Consuming Location(s), (iii) disable the

3

Scanned with CamScanner

System(s) to prevent the consumption of Product(s) by BUYER, (iv) cease making deliveries of Product(s) to BUYER, (v) impose new payment terms, including cash on delivery, (vi) bring an action at law or in equity against BUYER, or (vii) exercise any other right or remedy available to MTG.

(c) IF ANY PRODUCT(S) DOES NOT MEET THE SPECIFICATIONS SET FORTH IN THE APPLICABLE EXHIBIT A HERETO, BUYER SHALL NOTIFY MTG AND SHALL BE PERMITTED TO REJECT THE NONCONFORMING PRODUCT(S) ("OFFSPEC PRODUCT"). FAILURE OF BUYER TO GIVE NOTICE TO MTG OF A CLAIM BASED ON OFFSPEC PRODUCT WITHIN FIFTEEN (15) DAYS FROM DELIVERY OF SUCH OFFSPEC PRODUCT SHALL CONSTITUTE AN UNCONDITIONAL WAIVER BY BUYER OF ALL CLAIMS WITH RESPECT TO SUCH OFFSPEC PRODUCT. BUYER'S SOLE AND EXCLUSIVE REMEDY FOR EACH UNEXCUSED FAILURE OF MTG TO DELIVER PRODUCT(S) WHEN REQUESTED BY BUYER, (II) IN THE AMOUNTS REQUESTED BY BUYER, AND/OR (III) DELIVERY OF OFFSPEC PRODUCT, SHALL BE TO OBTAIN, AT NO CHARGE TO BUYER, REPLACEMENT PRODUCT(S) IN AN AMOUNT EQUAL TO SUCH UNDELIVERED PRODUCT FROM MTG.

8.   FORCE MAJEURE; ALLOCATION. (a) No failure or omission to carry out or observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim by BUYER against MTG, or be deemed to be a breach of this Agreement if such failure or omission shall be caused by or arise out of a Force Majeure Event. "Force Majeure Event" means any act, event, condition, or occurrence that (i) wholly or partially prevents MTG from performing its obligations under this Agreement, (ii) is beyond the reasonable control of and not the result of negligence of, MTG and (iii) MTG has been unable to overcome by the exercise of due diligence, and to the extent that the foregoing requirements are met, "Force Majeure Event" includes, but shall not be limited to, war, blockade, revolution, insurrection, riot, civil disturbance, sabotage, act of terrorism; a change in law; embargoes or sanctions; closing or accidents to assistances to or adjuncts of the shipping or transportation industry and delay of carriers; inability to obtain power or fuel; machinery breakdown; failure of normal sources of supply, rationing or allocation; action or inaction of any governmental authority; state of emergency; landslide; fire; explosion; flood; hurricane; tornado; earthquake; volcano; lightning strikes; hail storms; tidal waves; unusually severe weather conditions for the location of the Consuming Location, taking into consideration severity, duration and time of year of such conditions; an epidemic or quarantine; acts of god; strikes, labor disputes. (b) If MTG's ability to perform its obligations under this Agreement is affected by a Force Majeure Event, it shall as soon as practicable after it becomes aware of the occurrence of the Force Majeure Event give notice to BUYER of such event and an estimate of the Force Majeure Event's anticipated duration and effect on the performance of its obligations (to the extent such information is available). From and after the date MTG notifies BUYER that it will not be delivering some or all of the Product(s) resulting from a Force Majeure Event until the date that MTG notifies BUYER that the Force Majeure Event, and the repercussions thereof, has concluded and that it will recommence delivery of the Product(s) pursuant to the terms of this Agreement, BUYER shall have the right to acquire such volume of Product(s) (or substitute therefor) that MTG is failing to deliver from any third party. (c) Deliveries of Product(s) hereunder shall be made by MTG from the distribution center(s) normally serving the Consuming Location(s). If sufficient Product(s) from the distribution center(s) becomes unavailable for any reason, including a Force Majeure Event (each a "Product(s) Unavailability"), MTG may, in its sole discretion, apportion any remaining available Product(s) among its various customers, including the BUYER. During any Product(s) Unavailability, other than resulting from a Force Majeure Event, MTG shall also exercise commercially reasonable efforts to obtain replacement Product(s) from other sources within MTG's regular production and distribution center(s) or from other third parties, until such time as the Product(s) Unavailability ceases. MTG shall notify BUYER in writing of any such Product(s) Unavailability and, if applicable, the source and additional costs of any replacement Product(s). BUYER shall, within three (3) business days' receipt of such notice, inform MTG whether it accepts such replacement Product(s) (including the additional costs, if any) or decline such replacement Product(s).

9.   INDEMNITY. BUYER AGREES TO INDEMNIFY AND DEFEND MTG AND HOLD IT AND ITS OFFICERS, DIRECTORS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS (INCLUDING, BUT NOT LIMITED TO, ALL COSTS, EXPENSES, LOSSES, DAMAGES, PENALTIES, LIABILITIES AND REASONABLE ATTORNEYS' FEES) INCLUDING FOR DAMAGE OR INJURY TO ANY PERSON AND PROPERTY, ARISING AS A RESULT OF OR OTHERWISE CONNECTED TO BUYER'S ACTS OR OMISSIONS RELATED TO THIS AGREEMENT OR BUYER'S USE OR POSSESSION OF THE PRODUCT(S) AND/OR THE SYSTEM(S).

10.  REPRESENTATIONS AND WARRANTIES. (a) MTG warrants that the Product(s) delivered to BUYER shall comply with the specifications set forth in the Exhibit A hereto. MTG MAKES NO OTHER WARRANTY OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, INCLUDING THOSE ARISING UNDER THE UNIFORM COMMERCIAL CODE ("UCC"), EVEN IF MTG IS AWARE OF THE INTENDED PURPOSE OF THE PRODUCT(s), SUCH WARRANTIES BEING HEREBY EXPRESSLY DISCLAIMED. (b) BUYER represents and warrants that, throughout the Term, it has the unrestricted right to enter into this Agreement and to satisfy all obligations hereunder, and it is not obligated to buy any Product(s) for use at the Consuming Location(s) from any third party. BUYER shall indemnify MTG against any and all costs, expenses and damages (including, but not limited to, attorneys' fees) should the foregoing representations be inaccurate. BUYER also represents and warrants that all requisite approvals have been obtained authorizing the execution of and performance under this Agreement.

11.  LIMITATIONS OF LIABILITY. (a) BUYER acknowledges that there are hazards associated with the use and storage of the Product(s) and the System(s) and, in furtherance of Section 4(b)(9) of this Agreement, BUYER shall be responsible for warning, training and protecting (as appropriate, including at a minimum those required by applicable laws and regulations) BUYER's employees, officers, agents, customers and any other third party who may be in proximity of and/or exposed to such hazards resulting from BUYER's storage and use of Product(s) and/or System(s). BUYER assumes all risk of loss and liability for damage or injury to any persons and to the property of BUYER or any third party arising out of the delivery, storage and/or use of the Product(s) and/or System(s) whether used singly or in combination with other substances. (b) NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN OR IN ANY OTHER DOCUMENT, IN NO EVENT SHALL MTG BE LIABLE TO BUYER FOR ANY INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE, LIQUIDATED OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS OR BUSINESS OPPORTUNITY OR INTEREST, EVEN IF ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. (c) *WAIVER OF CONSUMER RIGHTS: BUYER WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION*

17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BUYER'S OWN SELECTION, BUYER VOLUNTARILY CONSENTS TO THIS WAIVER. (d) Other than damages resulting from bodily injury caused solely and directly by MTG's gross negligence or willful misconduct, MTG's aggregate liability for any and all damages or losses howsoever occurring, whether based in contract, tort, warranty, strict liability, negligence, equity or any other theory of law shall be limited to and not exceed the payment, if any, received by MTG for the quantity of Product(s) which failed to meet specifications or which was not delivered or service furnished or to be furnished, as the case may be, which is the subject of such claim or dispute, even if a term of this agreement fails of its essential purpose. BUYER agrees that the foregoing exclusion and limitation is a reasonable allocation of risk. No action, regardless of form, arising out of, or in any way connected with the Product(s), System(s) or this Agreement may be brought by BUYER more than ninety (90) days after the cause of action has accrued.

**12. DISPUTE RESOLUTION; GOVERNING LAW. (a)** If any dispute, controversy or claim arises between the parties out of or relating to this Agreement or any other document executed in connection herewith, or any breach hereof or thereof (each, a "Claim"), then either party may provide written notice thereof to the other, which shall include a detailed description of the Claim. Each party shall promptly designate a senior executive who shall have authority to resolve the Claim through negotiations. The senior executives shall meet within 30 days of the notice to attempt to resolve the Claim. **(b)** For any Claim that is not resolved by the senior executives within 30 days of commencing discussions, or such longer period as they may agree, the parties hereto irrevocably agree to settle such Claim by binding arbitration. The rules of the American Arbitration Association shall apply. The Claims shall be settled by three arbitrators appointed in accordance with these Rules. The seat of arbitration shall be Dallas, Texas. **(c)** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflict of laws principles.

**13. MISCELLANEOUS PROVISIONS. (a)** If a legal or equitable proceeding is instituted by MTG against BUYER to enforce its rights hereunder and MTG prevails, BUYER shall pay all of MTG's costs and expenses (including attorneys' fees) in connection with such enforcement. **(b)** This Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and replaces any previously existing agreement or arrangement between them, whether written or oral, prior to the Effective Date. **(c)** No terms or conditions in any purchase order issued or purportedly issued with respect to the purchase of Product(s) shall vary the terms of this Agreement and any terms and provisions of any purchase order that are contradictory to this Agreement and/or the applicable Exhibit A shall be deemed null and void. No modification or waiver of the terms of this Agreement shall bind BUYER or MTG unless in writing and signed and accepted by a duly authorized representative of both parties. **(d)** The failure of either party to seek performance by the other of any provision hereof shall in no way affect such party's right to seek performance at a future time and no waiver by either party of a breach of any provision hereof shall be taken or held to be a waiver of any succeeding breach or as a waiver of the provision itself. **(e)** In the event any provision herein is held to be invalid, unenforceable or illegal by any court or regulatory authority having jurisdiction, that provision shall be severed from the Agreement and the balance of this Agreement shall be construed and enforced as if it did not contain such invalid or unenforceable provision. The parties shall promptly negotiate in good faith to replace such provision by a valid, enforceable or legal provision containing terms as nearly like the severed provision as possible. **(f)** This Agreement shall inure to the benefit of, and shall be binding upon, the parties and their permitted successors and assigns. MTG may assign this Agreement to any affiliate or subsidiary, without BUYER consent. BUYER shall not assign its rights under this Agreement (whether directly, indirectly by a change of control or by sale of all or substantially all of its assets) without MTG's prior written consent, which consent may be rejected if MTG determines the assignee does not have acceptable credit. **(g)** The provisions of Sections 9, 11, 12 and 13 shall survive the termination of this Agreement. **(h)** The terms and conditions of the applicable Exhibit A hereto are incorporated herein by reference. **(i)** This Agreement may be executed in any number of counterparts, the combination of which shall be construed as the entire executed Agreement. **(j)** A person who is not a party to this Agreement shall have no right to enforce any of its terms and this Agreement is not intended to give any person other than the parties hereto and their permitted successors and assigns any rights hereunder. **(k)** Defined terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (v) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein) (w) any reference herein to any Person shall be construed to include such Person's successors and assigns, (x) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (y) all references herein to Sections and Schedules shall be construed to refer to Sections of, and Schedules to, this Agreement, and (z) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

IN WITNESS WHEREOF, MTG and BUYER have caused this Agreement to be executed by their respective duly authorized representatives as of the Effective Date following review of the terms and conditions by their respective legal representatives or (as applicable) waiver of legal review.

| GB Sciences Louisiana, LLC / Good Day Farms | MATHESON TRI-GAS, INC. |
|---|---|
| Signature: _Conner Hennessy_ | Signature: |
| Printed Name: Conner Hennessy | Printed Name: |
| Title: National Director Supply Chain | Title: |
| Date: 9/14/23 | Date: |

Scanned with CamScanner



## MATHESON
### The Gas Professionals

### AMENDMENT 1 TO PRODUCT SUPPLY AGREEMENT - BULK

This Amendment 1 (the "Amendment") to the Product Supply Agreement – Bulk with an Effective Date of 8/22/2023 ("Agreement") is entered into by and between Matheson Tri-Gas, Inc. ("MTG") and GB Sciences Louisiana, LLC / Good Day Farm ("BUYER") hereby amends the Agreement effective as of 9/12/2023. Capitalized terms used in this Amendment that are not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

1. MTG and Buyer agree to the following changes to the Agreement.

   A.) 2.TERM. Delete sentence 3 in it's entirely and replace with – "This Agreement shall automatically renew for successive terms equal in length to the Initial Term (each a "Renewal Term"), unless notice of termination is received by either party not less than twelve (12) months (a) prior to the expiration of the Initial Term or each successive Renewal Term or (b) from the effective date of any amendment to this Agreement or any Exhibit A hereto."

   B.) This Agreement is subject to the renewal of the Agreement for Services dated September 14, 2017, between the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College on behalf of the Louisiana State University Agricultural Center and Buyer. If the Agreement for Services is not renewed, this Agreement shall terminate immediately upon the expiration of the Agreement for Services. Additionally, in the event of a change in state or federal law, regulation, or enforcement that materially and adversely affects the business operation of Buyer or the subject matter of this Agreement, either party may elect to terminate this Agreement by providing the other party at least (90) days advance written notice of termination.

2. Except as expressly amended hereby, all other terms and conditions of the Agreement and the Packaged Gas Rider (if applicable) shall remain in full force and effect as originally written. This Amendment shall be governed by and construed in accordance with the laws of the State of Texas.

IN WITNESS WHEREOF, MTG and BUYER have caused this Amendment to be executed by their respective duly authorized representatives as of the date stated above.

| GB Sciences Louisiana, LLC / Good Day Farm | MATHESON TRI-GAS, INC. |
|---|---|
| Signature: | Signature: |
| Printed Name: Spencer Hennessy | Printed Name: |
| Title: National Director Supply Chain | Title: |
| Date: 9/14/23 | Date: |

Scanned with CamScanner

EXHIBIT A-1 TO PRODUCT SUPPLY AGREEMENT – BULK

This Exhibit A-1 to the Product Supply Agreement – Bulk ("Exhibit A-1") is incorporated into and made a part of that certain Product Supply Agreement – Bulk effective 8/22/2023 ("Agreement") by and between Matheson Tri-Gas, Inc. ("MTG") and GB Sciences Louisiana, LLC / Good Day Farms ("BUYER"). In the event of any conflict between the terms and conditions of this Exhibit A-1 and the Agreement, the terms and conditions of this Exhibit A-1 shall prevail. All capitalized terms used herein and not otherwise defined shall bear the meanings assigned to them in the Agreement.

| 1. Effective Date of Exhibit A-1 | First Fill of Product |
|---|---|
| 2. Initial Term | 60 Months |
| 3. Consuming Location | 600 Franke Drive<br>Ruston, LA 71270 |
| a. Product(s) | Carbon Dioxide |
| (i) Specifications of Product(s) | Industrial Grade, Bulk, Liquid, Carbon Dioxide |
| (ii) Estimated Monthly Volume ("MMPA") | 20 Tons |
| (iii) Product Price (UOM) | $ 0.12 / LB. |
| b. System | 14 ton bulk vessel and related equipment |
| c. Monthly Service Charge / Month | $950.00 |
| d. Installation Cost | $0.00 |
| e. Telemetry / Month | Yes [X]   No [ ]   Monthly Charge $ 100.00 |
| f. Annual Inspection Fee | $0.00 |
| g. Surcharge | $0.00 |
| h. Delivery | $75.00 |
| i. Safety and Compliance Charge | $0.00 |
| j. Customer-owned bulk storage system will be used | Yes [ ]   No [X] |
| (i) Maintenance charge | $0.00 on rented equipment |
| 4. Other | |

NOTE: All other pricing for Products, Systems and other related costs and services not otherwise specified above shall be subject to MTG's then current pricing for similarly situated customers.

In accordance with Section 6 of the Agreement, all notices shall be sent to the following addresses (as applicable):

| Signature: _Amy Wilson_ | Signature: |
|---|---|
| GB Sciences Louisiana, LLC / Good Day Farms | Matheson Tri-Gas, Inc. |
| Attn:   Spencer Hennessy | Attn: Product Management |
| 600 Franke Drive | 909 Lake Carolyn Parkway; Suite 1300 |
| Ruston, LA 71270 | Irving, TX 75039 |
| Email:  SHENNESSY @ GoodDayFARm.com | Email: BulkContractAdmin@mathesongas.com |
| Date:   9/14/23 | Date: |

September 11, 2023

Airgas USA, LLC                                    Mid-South Airgas USA, LLC
25227 Grogans Mill Road, Ste. 200                  31 North Peoria
The Woodlands, TX 77380                             Tulsa, OK 74120

     RE:   Notice of Termination
              Indoor Farming and Biomass Extraction Product Sale Agreement
              Airgas USA, LLC, and GB Sciences Louisiana, LLC

Dear Gary:

This letter responds to your request for additional information following your receipt of our July 3, 2023 written Notice of Termination.

Per La. R.S. 40:1046, LSU AgCenter is the holder of a license to produce medical marijuana. Under that license and an Agreement for Services, GB Sciences, Louisiana, LLC/Good Day Farm Louisiana, LLC (GDFL) provides the cultivation, extraction, processing, and production of medical marijuana for qualified patients in Louisiana. GDFL intentionally avoided acting in haste by closely monitoring over the years how the progressive changes in Louisiana's Adult Use Hemp Product Law are adversely affecting its medical marijuana business operations and attempting steps to mitigate its damages. After exhausting potential legislative remedies most recently during the 2023 Regular Session, GDFL exercised its termination rights under the Indoor Farming and Biomass Extraction Product Sale Agreement.

## I.    Evolution of Louisiana's Adult Use Hemp Product Law 2018-2023

GDFL has been closely monitoring the changes in federal and state law that have had material and adverse effects on its medical marijuana business operations.

The 2018 Farm Bill removed hemp, defined as cannabis (*Cannabis sativa L.*) and derivatives of cannabis with extremely low concentrations of the psychoactive compound delta-9-tetrahydrocannabinol (THC) (no more than 0.3% THC on a dry weight basis), from the definition of marijuana in the Controlled Substances Act (CSA). In response, Act 164 of the 2019 Louisiana Regular Session – the Industrial Hemp Law – was enacted recognizing industrial hemp as an agricultural commodity in Louisiana. Act 164 (2019) allowed the commercial cultivation and processing of hemp in Louisiana, as well as the sale of industrial hemp derived cannabidiol (CBD) products in Louisiana. Act 164 (2019) specifically envisioned that the CBD products allowed would be separate and distinct from the products available and regulated under the state's therapeutic marijuana program found at La. R.S. 40:1046. On December 23, 2019, Louisiana's industrial hemp plan was approved by the U.S. Department of Agriculture.

The next year, the Legislature adjusted Louisiana's industrial hemp program via Act 344 (2020). Importantly, in 2020 the Legislature left in place the limitation that only CBD products could be produced, marketed, and sold as part of Louisiana's industrial hemp program.

A significant legal change to the Louisiana hemp industry occurred during the 2021 Regular Session. Act 336 (2021) changed the definition of products allowed to be produced, marketed, and

sold as part of Louisiana's *industrial* hemp program from CBD products to a much broader "consumable hemp product." The expansive change authorized a "product derived from industrial hemp that contains any cannabinoid...and is intended for consumption or topical use." This change allowed for *any* cannabinoid to be included in a consumable hemp product – *any* cannabinoid including THC – rather than just CBD.

Another significant feature of Act 336 (2021) is that it purported to limit the THC concentration in consumable hemp products "on a dry weight basis." This form of measurement is only applicable to floral hemp products meaning the law was silent as to the allowable limits of THC in non-floral consumable hemp products. This led to early movers in the consumable hemp product space in Louisiana exploiting the substantial gap in the law by marketing and selling consumable hemp products containing significant levels of psychoactive THC over the counter. These early movers utilized the wide-open existing distribution chain permitted for CBD only products, which included thousands of vape shops, gas stations, and grocery stores.

In 2022, instead of rectifying the gapping loophole, the Legislature codified the allowable levels of THC in consumable hemp products by setting a ceiling of eight (8) milligrams "per serving" via Act 498 (2022). The definition of "serving" in Act 498 (2022) gave consumable hemp manufacturers and distributors full discretion to define what is a "serving." Act 498 (2022), by legitimizing consumable hemp products containing significant psychoactive THC levels and allowing those products to remain in a lax regulatory environment previously designed for non-psychoactive CBD only hemp products, poured fuel on the fire of the over-the-counter THC market in Louisiana rather than closing the gapping loophole that had allowed it to surreptitiously sprout.

In 2023, two different bills were introduced to "put the genie back in the bottle" on adult use hemp products, and much debate was heard acknowledging the explosion of the availability of unregulated THC products at gas stations and grocery stores. Ultimately, no legislative action was taken leaving the framework from Act 498 (2022) in place.

## II.    Status of Louisiana's Adult Use Hemp Market and Impact on GDFL

As a result of the changes in law over the past five years, there is a robust and growing deregulated consumable hemp market in Louisiana that is imposing a significant adverse impact on Louisiana's strictly regulated medical marijuana program. Over 2,100 licenses have been issued by ATC to truck stops, smoke shops, convenience stores, grocery stores and gas stations to sell over-the-counter THC products in Louisiana. Louisiana Office of Alcohol and Tobacco Control - Consumable Hemp Downloads - Permits. Over 2,400 THC products have been approved by LDH. La Dept. of Health - searchable database of registered consumable hemp products.

Please see the following chart for a comparison of the adverse commerce frameworks created by the change in law between the deregulated adult-use consumable hemp THC marketplace and the strictly regulated medical marijuana program that manufactures and sells THC products:

| CONSUMABLE HEMP | MEDICAL MARIJUANA |
|---|---|
| Primary Product Ingredient | Primary Product Ingredient |
| THC | THC |
| Forms of THC Products | Forms of THC Products |
| Tinctures, gummies, edibles, beverages, non-smokable flower | Tinctures, gummies, edibles, beverages, vapes, smokable flower |
| Product Approval | Product Approval |
| None | LDH and LBP |
| Packaging and Label Approval | Packaging and Label Approval |
| LDH | LDH and LBP |
| Requirements to Purchase | Requirements to Purchase |
| 21 years of age | Medical condition, recommendation from healthcare provider, 21 years of age |
| Laboratory Testing | Laboratory Testing |
| No labs in LA testing any products | Testing by two LDH-approved, accredited labs located in LA |
| Source of THC | Source of THC |
| Indeterminable | LA cultivators regulated by LDH |
| Lab-created or synthetic THC products | Lab-created or synthetic THC products |
| Yes | No, only naturally occuring plant-based products |
| THC Product Tracking System | THC Product Tracking System |
| None | MJSTRC (seed-to-sale tracking) |
| Licensed Sales Outlets | Licensed Sales Outlets |
| Over 2,100 | 10 pharmacies licensed (30 locations) and regulated by LBP |
| Outlet Location | Outlet Location |
| No restrictions | Restricted to Regions and LBP regulations |
| Outlet Personnel | Outlet Personnel |
| non-medical | Pharmacist-in-charge, pharmacy technicians regulated by LBP |
| Limits on THC Products Purchased | Limits on THC Products Purchased |
| None | Restricted by LBP |
| Dispensing Tracking | Dispensing Tracking |
| None | Prescription Monitoring Program |
| Adverse Medical Events Tracking | Adverse Medical Events Tracking |
| None | Healthcare providers required to report adverse medical events to database |
| Percentage of Products Made in LA | Percentage of Products Made in LA |
| Less than 5% | 100% |
| Consumable Hemp Annual Fee | Medical Marijuana Annual Fee |
| $175 - $1,375 | $100,000 |
| Annual University Fee | Annual University Fee |
| None | $1,000,000 - $2,000,000 |
| Gross Receipts Tax | Gross Receipts Tax |
| 3% | 7% |
| Federal §280E Tax Consequences | Federal §280E Tax Consequences |
| None | Prohibited from using most ordinary business deductions |

The explosive growth of the deregulated adult-use consumable hemp THC marketplace in Louisiana is shown by the Louisiana Department of Revenue - Statement of Net Collections and Distributions data. Annual retail sales of adult use hemp products have increased from approx. $3.79M in FY 2019-20 to $31.3M in FY 2022-23. Taking the last quarter of FY2022-2023 as a guide, the projected annual retail sales will reasonably and conservatively top $40M in FY 2023-2024 and beyond. The adverse commerce framework resulting from the deregulated parallel hemp-derived THC marketplace created by the 2018 Farm Bill and Acts 164 (2019), 344 (2020), 336 (2021) and 498 (2022) is materially and adversely affecting the monthly bottom line gross sales of the strictly regulated medical marijuana marketplace.

Using the Department of Revenue tax collection data, the approximately $40M in annual sales for adult use hemp THC products results in a significant damage figure to GDFL due to the change in the law. The following chart shows the annual damage using the $40M and assuming the following: keystone retail pricing (i.e., 100% retail markup); 50% of the consumable hemp THC consumers would be medical marijuana program patients but for the change in law creating the deregulated hemp THC marketplace; and GDFL has an 80% medical marijuana market share it currently enjoys.

| $40,000,000 | Gross annual retail hemp sales |
|---|---|
| | 100% Keystone retail markup |
| $20,000,000 | Gross annual wholesale sales |
| 50% | Would be medical marijuana patients |
| $10,000,000 | Lost annual medical marijuana wholesale sales |
| 80% | GDFL medical marijuana market share |
| $8,000,000 | GDFL lost annual medical marijuana wholesale sales |

Based on the above, GDFL's business operations are being adversely impacted due to the change in the adult use hemp THC products law.

## III.    Notice of Termination of Agreement

Our advance written notice of termination of the Indoor Farming and Biomass Extraction Product Sale Agreement was made pursuant to §2 (and §24). Section 2 provides, in pertinent part:

> Additionally, in the event of any change in state or federal law, regulation, or enforcement that materially and adversely affects the business operations of Buyer or the subject matter of this Agreement, either party may elect to terminate this Agreement by providing the other party with at least thirty (30) days advance written notice of termination.

As we shared, we have been closely monitoring the material and adverse effects on our medical marijuana business operations starting with the change in federal law when Congress passed the 2018 Agriculture Improvement Act that legalized the possession and cultivation of hemp followed by change in Louisiana law when the legislature passed Act 344 (2020), Act 336 (2021) and Act 498 (2022). We shared above, in response to your request for additional information, how the proliferation and sale to anyone over the age of 21 of over-the-counter THC products without the need for a medical recommendation has materially and adversely affected our business operations and economic bottom line. We confidentially shared with you that we will be closing the Baton Rouge facility as soon as commercially reasonable. The decision to terminate this Agreement was not taken lightly and we avoided acting in haste by closely monitoring how the progressive changes in law are adversely affecting our business operations and exhausting our options to mitigate the damage caused by the changes in law.

Thank you for your consideration and cooperation in accepting our termination of this Agreement pursuant to §2 (and §24). This letter is not to be construed as a waiver or relinquishment of any other provisions, conditions, rights, remedies, or other grounds for termination of the Agreement.

Sincerely,

Anthony Cieslak
COO, GB Sciences Louisiana, LLC, dba Good Day Farm
425 West Capitol Ave.
14th Floor
Little Rock, AR 72201

Ex. 4 - GBSL Response



**MATHESON**
The Gas Professionals

<u>PRODUCT SUPPLY AGREEMENT - BULK</u>

This Product Supply Agreement ("Agreement") is entered into by and between Matheson Tri-Gas, Inc. ("MTG") and GB Sciences Louisiana, LLC / Good Day Farms ("BUYER") as of 8/22/2023 (the "Effective Date"). All capitalized terms used but not defined in this Agreement shall have the definitions assigned thereto in the applicable Exhibit A hereto (as the same may be appended or amended by agreement of the parties hereto from time to time).

1.    SALE AND PURCHASE. During the Term, MTG agrees to sell to BUYER and BUYER agrees to purchase from MTG, all of BUYER's present and future requirements of the Product(s) listed in one or more Exhibits A hereto and all other gases (either in liquid or gaseous form), safety products and welding products in every form for use in connection with BUYER's operations now or hereafter conducted at the Consuming Location. If BUYER's operations are relocated or expanded at any other location while this Agreement is in effect then, at MTG's sole option, this Agreement shall apply to such other locations as well. BUYER's ability to manufacture or produce Product(s) itself shall not relieve BUYER from its obligation to purchase its requirements pursuant to this Agreement and BUYER shall not purchase any substitute for any Product(s) delivered by pipeline from any producing facility or equipment (whether on-site or off-site) or lease, purchase or otherwise acquire any facility or equipment that produces any Product(s) or substitute therefor (either in liquid or gaseous form) from any third party, other than as permitted in Section 8 below. BUYER agrees to purchase all Product(s) at the prices, charges and fees (aggregately, "Prices"), set forth in one or more Exhibits A hereto.

2.    TERM. This Agreement shall be effective as of the Effective Date. The initial term of this Agreement (as set forth in the applicable Exhibit A hereto) shall commence on the later of the Effective Date and the first day of the first month following the date of first delivery of Product(s) to the last System installed by MTG or storage vessel or system owned by BUYER (the "Initial Term"). This Agreement shall automatically renew for successive terms equal in length to the Initial Term (each a "Renewal Term"), unless notice of termination is received by either party not more than eighteen (18) months and not less than twelve (12) months (a) prior to the expiration of the Initial Term or each successive Renewal Term or (b) from the effective date of any amendment to this Agreement or any Exhibit A hereto. (When used herein, "Term" shall be deemed to include Initial Term and any Renewal Term, as applicable.)

3.    DELIVERIES. As to both parties' performance under this Agreement, time is of the essence.
(a) Upon completion of initial delivery of Product(s), BUYER shall be deemed to have accepted the installation of the applicable System(s). MTG may, in its sole discretion, make deliveries of Product(s) in a quantity less than seventy five percent (75%) of the capacity of any single System or in excess of one hundred ten percent (110%) of BUYER's Estimated Monthly Volume ("Nonstandard Deliveries"). If BUYER continues to request Nonstandard Deliveries for a period of ninety (90) consecutive days or more, MTG shall be permitted to increase Prices. Additionally, should MTG elect to make Nonstandard Deliveries, BUYER shall reimburse MTG for any and all other documented and reasonable expenses or costs that MTG may incur; (b) MTG may refuse to deliver Product(s) to the Consuming Location if MTG reasonably believes that the Consuming Location itself, the area surrounding the System, the access way to the System, or the condition of BUYER's storage vessel or system is unsatisfactory, unsafe or violates MTG's safety protocols or any applicable law or regulation at any time during the Term of this Agreement. MTG shall advise BUYER of the reasons for nondelivery as soon as reasonably practical and may condition future deliveries of Product(s) to completion of corrective action by BUYER, to the reasonable satisfaction of MTG; (c) All Product(s) shall be delivered F.O.B. MTG's delivery vehicle or MTG's production facility if MTG's delivery vehicle is not used, and title and risk of loss or damage as to Product(s) shall pass to BUYER at such time; (d) MTG shall have the right to install telemetry systems with the System(s). It shall be solely BUYER's responsibility to monitor its inventory of Product(s), regardless of whether MTG installs a telemetry system for measuring the Product(s) inventory in the System(s); (e) BUYER will allow MTG to make deliveries twenty-four (24) hours per day, seven (7) days per week. In the event BUYER requires deliveries on a more restrictive basis, causes frequent delivery delays, requests the delivery of Product(s) upon less than forty-eight (48) hours prior written notice or otherwise changes the terms of MTG's access to the System(s), then BUYER will reimburse MTG for any additional costs incurred by MTG; and (f) If BUYER continues to request and/or accept deliveries of Product(s) after the expiration of the Term, then, in MTG's sole and absolute discretion, any nonrenewal notice shall be deemed rescinded and void and a new Renewal Term shall commence as of the expiration date of the then applicable Term.

4.    BULK STORAGE SYSTEM.
(a)    MTG shall: (1) Deliver at the Consuming Location(s), at BUYER's sole expense, a bulk storage system or systems including any safety and control apparatus, telemetry systems, low-temperature devices and vaporization equipment associated therewith that MTG determines are reasonably adequate to meet BUYER's Estimated Monthly Volume (the "System(s)"). "System" shall include all of the foregoing equipment, safety and control apparatus and other devices and systems up to but excluding the point of connection with BUYER's piping but shall not include any storage vessel or system owned by BUYER; (2) Install such System(s) upon concrete foundation(s) or other improved area(s) in the Consuming Location(s) acceptable to MTG and connect said System(s) to piping installed by BUYER; (3) Maintain and repair said System(s) according to MTG's standard practices and carry out, at BUYER's expense, an annual safety inspection of each System. If MTG has agreed to deliver Product(s) to a bulk storage system owned by BUYER, MTG may, at BUYER's request and expense, maintain and/or perform safety inspections upon such bulk storage system; (4) In connection with the maintenance and repair of the System(s), shut down the System(s) (whether scheduled in advance and notified to BUYER or not) or remove said System(s) from the Consuming Location(s) and substitute it for a System(s) of appropriate type and size if, in the sole opinion of MTG, the System(s) require(s) maintenance or repairs that cannot be performed in a safe and/or practical manner at the Consuming Location(s). MTG may also replace or substitute the System(s) if BUYER's monthly consumption of Product(s) changes significantly; and (5) On or before the initial delivery of the Product(s), make available to BUYER copies of such Safety Data Sheets ("SDS") as required by law, and provide electronic copies upon BUYER'S request.
(b)    BUYER shall, at BUYER's sole cost and expense: (1) Provide and maintain at all times a clean and safe site at the Consuming Location(s), on conditions acceptable to MTG. Provide a concrete foundation(s) or other improved area(s) reasonably acceptable to MTG

Scanned with CamScanner

that meets all applicable federal, state and local requirements for placement and installation of the System(s) and delivery and storage of the Product(s). Such site shall be free from overhead and underground obstacles; (2) Provide fencing and security around the System(s) and prevent any person not expressly authorized by MTG from tampering with, repairing, moving or accessing the System(s). BUYER shall provide and/or reimburse MTG for the costs and expenses of any certificates, permits, governmental or insurance company annual inspection fees for the System(s). System(s) shall remain in the sole and exclusive possession of BUYER for the Term, unless removed by MTG as specified in Section 4(a) above; (3) Install and maintain in good condition all piping, connections and apparatus necessary for distribution of Product(s) from the System(s), complying with the technical specifications set forth in Exhibit A; (4) Furnish and pay for lighting, water, telephone lines, power and steam and other applicable utilities as required for the System(s). BUYER shall reimburse MTG for any additional costs (including engineering costs) required to design, certify, or make changes to any existing or new concrete foundation(s) for the installation and placement of the System(s); (5) On or prior to delivery and installation of the System(s), BUYER shall deliver to MTG an easement, waiver of rights in the System(s) or such other documentation as may be necessary, from BUYER or, if BUYER is not the owner of the Consuming Location(s), from the owner of the Consuming Location(s), acknowledging MTG's ownership in the System(s) and granting to MTG and MTG's representatives unfettered entrance to the Consuming Location(s) and access the System(s) at all times for the Term; (6) On or prior to delivery and installation of the System(s) and on each anniversary of the Effective Date during the Term, BUYER shall deliver to MTG a copy of the commercial liability insurance policy (or renewal thereof if applicable) for the Consuming Location(s) identifying MTG as an additional insured; (7) Notify MTG immediately of any unsafe or irregular condition or occurrence involving the System(s), including any damage to, malfunction of or changes in the System(s). BUYER shall not, and shall not allow any third party to, tamper with, maintain, modify or repair the System(s) without the prior written consent of MTG; (8) Provide an access roadway and area adjacent to all System(s) acceptable to MTG to facilitate delivery of Product(s) and the parking of MTG's delivery vehicles. If the Product is an oxidizer, the aforementioned hard-surface parking area must be constructed of concrete; (9) Prohibit the use or storage of oil, grease or lubricants or any hazardous, flammable or combustible materials in, on or near the System(s) and/or the concrete foundation on which the System(s) is located or the Product(s) is delivered; (10) Comply with all applicable laws, regulations, rules and ordinances applicable to the Consuming Location(s) related to the System(s), the delivery by MTG of Product(s) and BUYER's use and storage of the Product(s) and System(s) including, but not limited to, zoning, licensing, permitting and all applicable environmental, health and safety laws and regulations, including but not limited to (i) relevant reporting obligations under the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. §§11001-11049 (EPCRA, also commonly known as Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA Title III)), or reporting obligations under other laws or regulations, resulting from the presence, use or accidental release of the Product(s) supplied under this Agreement, and (ii) the Occupational Health Act of 1970 and the implementing regulations of the Occupational, Safety and Health Agency, and State equivalents, including but not limited to the Hazard Communication Standard; (11) Reimburse MTG at MTG's then-prevailing rates for the cost of any temporary System(s) used during the installation, modification, repair and/or relocation of the System(s); (12) Pay to MTG its costs to (i) deliver and remove the System(s) to/from the Consuming Location(s) from/to the point of storage or manufacture, as the case may be; (ii) inspect the System(s) as required by applicable law; and (iii) provide labor, parts, and materials for any service call made by MTG for any reason except for routine maintenance performed upon System(s) by MTG; (13) To the extent required under applicable environmental, health and safety laws and regulations, BUYER will, among other things, develop and implement a written chemical hazard communications program for BUYER's employees with respect to the Product(s). BUYER will not use the Product(s) without first consulting the SDS. BUYER shall provide all persons who might become exposed to the Product(s) with copies of the SDS and such other training and precautionary measures as necessary, including at a minimum those required by applicable laws and regulations, to avoid any damage or injury.

(c) Notwithstanding the manner in which the System(s) may be affixed to any real property, the System(s) shall be deemed to be personal property of MTG and a fixture. BUYER shall not suffer or allow said System(s) to become subject to any lien, claim or encumbrance, and shall promptly cause any such lien, claim or encumbrance to be released. BUYER shall not remove any labels or evidence of ownership affixed to the System(s). Title to all System(s) shall at all times remain with MTG and, upon termination of this Agreement at the end of the Term or otherwise, MTG may, subject to Section 5(b) of this Agreement, remove the System(s), at BUYER's expense, without notice or consent. To the extent any refurbishment to the System(s) is required in order to redeploy the System(s), BUYER shall pay to MTG a refurbishment fee not to exceed fifteen percent (15%) of the total Monthly Service Charges due during the applicable Term for such System(s). BUYER hereby authorizes MTG to execute and file any security and/or title documents as may be necessary or advisable to evidence MTG's title to the System(s), including filing UCC financing statements regarding such System(s), and shall reimburse MTG for all such expense.

(d) If, in MTG's or BUYER's opinion, additions and/or modifications to the System(s) are required or the System should be relocated (whether due to changes in BUYER's methods or locations of use, changes in the accessibility to the System(s), changes to MTG's or BUYER's internal safety protocols or changes required by law) MTG may make such addition, modification and/or relocation as MTG deems reasonably necessary, at BUYER's expense. In such an event, the Service Charge may be increased or decreased in accordance with MTG's then-prevailing prices and rates for such additional or different System(s) and a new Renewal Term shall begin from the date such addition, modification and/or relocation is completed. BUYER agrees that the minimum size System(s) to be installed by MTG shall be capable of storing a six (6) week supply of Product or enough Product to support two (2) days of continuous consumption by BUYER, whichever is greater, based upon either BUYER's Estimated Monthly Volume or its applicable Product consumption during the prior six (6) months.

(e) IT IS EXPRESSLY AGREED THAT, UNTIL THE SYSTEM(S) ARE RETURNED TO MTG, ALL RISK OF LOSS OR DAMAGE TO THE SYSTEM(S) IS HEREBY ASSUMED AND SHALL BE BORNE BY BUYER (REGARDLESS OF THE CAUSE OR ANY DEGREE OF NEGLIGENCE BY MTG OR FOR BREACH OF WARRANTY OR CONTRACT OR FOR STRICT LIABILITY) UNLESS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF MTG. FOR SYSTEM(S) DAMAGED BEYOND REPAIR, BUYER SHALL PAY TO MTG, ON DEMAND, THE FULL REPLACEMENT VALUE OF THE SYSTEM(S) AT MTG'S THEN-PREVAILING PRICES AND RATES. FOR DAMAGE TO SYSTEM(S) THAT MTG IS ABLE TO REPAIR, BUYER SHALL PAY MTG THE ACTUAL COSTS OF THE REPAIRS. BUYER SHALL MAINTAIN ADEQUATE FIRE AND EXTENDED INSURANCE COVERAGE FOR THE BENEFIT OF MTG COVERING SUCH SYSTEM(S) AND SHALL PROMPTLY PROVIDE EVIDENCE THEREOF (INCLUDING EACH ANNUAL RENEWAL) TO MTG.

2

Scanned with CamScanner

(f) If BUYER's requirements for Product(s) cease to exist prior to the expiration of the Term for any reason, BUYER will reimburse MTG for the costs of removing the System(s). However, unless otherwise agreed by the parties in writing, the removal of any or all of MTG's System(s) shall not be deemed to be a termination or rescission of this Agreement.

(g) In the event that BUYER requests that MTG deliver Product(s) to BUYER's bulk storage system, BUYER shall be solely liable for the maintenance of such storage system, provide adequate training to MTG's delivery personnel regarding such storage system, indemnify and defend MTG for any and all claims arising as a result of MTG's delivery of Product(s) into such storage system and otherwise comply with the applicable requirements of Section 4(b) regarding such storage system.

**5.  REVISION OF PRICES; PAYMENT.**
The Monthly Service Charge shall commence on the first date specified in Exhibit A.

(a) From time to time MTG shall have the right to revise the Price(s). Any such Price revisions shall be reflected in the immediately succeeding monthly invoice. To the extent any such Product Price revision will be in excess of five percent (5%) of the then-applicable Price, MTG shall notify BUYER in writing of such revision and BUYER may, within fifteen (15) days after the date of said notice, furnish MTG with a Competing Bid. For purposes of this Section 5(a), a "Competing Bid" is copy of a bona fide firm written offer from a reputable producer of the applicable Product(s) offering to sell BUYER the applicable Product(s) in like quantities, like quality, under similar terms and conditions and at a lower Product Price. If, within twenty (20) days from receipt of the Competing Bid, MTG shall not agree to either (i) match the pricing in the Competing Bid, or (ii) withdraw the applicable Product Price revision, whichever is higher, BUYER shall have the right to terminate this Agreement with respect to the applicable Product(s). In such case, BUYER shall, within thirty (30) days thereafter, give MTG notice of termination of this Agreement. Such termination date shall be effective no sooner than sixty (60) days after the termination notice; provided, however, that if MTG notifies the BUYER in writing that it will match the Competing Bid or withdraw the applicable Product Price revision, whichever is higher, by the later of twenty (20) days from MTG's receipt of the Competing Bid or five (5) business days from MTG's receipt of the termination notice, MTG shall have the right to extend the Term by the term provided in such Competing Bid or the Renewal Term, whichever is greater.

(b) In the event that MTG makes available but BUYER fails to take delivery of at least the Minimum Monthly Purchase Amount ("MMPA") set forth on the applicable Exhibit A hereto during any month of the Term (the "MMPA Shortfall"), MTG may invoice BUYER for the amount of Product associated with the MMPA Shortfall at the current Price. Any MMPA Shortfall so invoiced by MTG shall be included in the invoice in the month following the occurrence of the MMPA Shortfall and shall be paid by BUYER in accordance with this Agreement. The MMPA shall be prorated for any partial month. If there is an MMPA Shortfall for three (3) or more consecutive months, at the request of the MTG or the BUYER, the parties shall meet in good faith to negotiate an adjustment to the MMPA and the Price for the remainder of the Term.

(c) All payments due to MTG hereunder shall be made to MTG at the location or the bank account indicated on MTG's invoice without set-off or withholding. All invoices shall be due and payable by BUYER within ten (10) days from the date of invoice (or upon demand if reasonably deemed necessary by MTG), and such invoices shall be conclusively presumed to be correct unless BUYER objects to any charges therein within thirty (30) days of the date of invoice. Notwithstanding any notice of termination delivered by BUYER in accordance with Section 2 above, this Agreement shall be deemed renewed for an additional Renewal Term if any amount due, including estimated removal costs and fees of any System(s) (which shall be billed 30 days prior to any such removal), is not paid in full on or before the termination date. Upon completion of the removal and shipment of the System(s), MTG will reimburse BUYER for any positive difference between the estimated removal costs paid by BUYER and the actual costs incurred by MTG. To the extent the BUYER does not make payments by wire transfer, MTG reserves the right to charge administrative fees associated with any other payment method where applicable. MTG reserves the right to add a monthly service charge of eighteen percent (18%) per annum to any delinquent balance. BUYER agrees to report and to pay any and all taxes upon the sale, delivery, storage, lease, rental and/or use of the Product(s) and System(s) including, but not limited to, real or personal property taxes along with any excise tax imposed upon MTG as a result of its performance under this Agreement.

(d) From time to time MTG may need to recover for unusual or unexpected cost increases including, but not limited to, the costs of complying with federal, state and local laws and regulations involving the storage, transportation, handling and/or disposal of hazardous materials, energy and/or fuel price changes, loss of local production facilities, raw material or commodity supply dislocations, and other similar events ("Surcharges"). The amount of the Surcharge may not be specifically related to actual costs incurred by MTG and may vary by the type of Product(s), System(s), service, geographic location or time. Surcharges, unless otherwise specified, shall not include federal, state or local taxes nor be required by any federal, state or local agency or authority. All Surcharges shall be invoiced by MTG and paid by BUYER in accordance with this Agreement.

**6.  NOTICES. (a)** Any notices sent pursuant to Sections 4(b)(6), 5(a) (other than notices of termination by BUYER), 5(c) or 8 shall be sent by electronic mail transmission from the respective sender's electronic mail address and to the respective receiver's electronic mail addresses set forth in the applicable Exhibit A hereto. Such notices shall be deemed effective upon receipt. **(b)** Any notices sent pursuant to Sections 2, 5(a) (as to only a notice of termination from BUYER), 7(b)(i) or 7(c) shall be sent by certified mail, return receipt requested, or overnight messenger from an internationally recognized courier, to the applicable recipient's address set forth in the applicable Exhibit A hereto. Such notices shall be deemed effective upon confirmed receipt or refusal to accept delivery. **(c)** Each party covenants that it shall advise the other in writing if its mailing address and/or electronic mail address for notices changes during the Term of this Agreement.

**7.  DEFAULT AND REMEDIES.**
(a) Any of the following shall be considered a "Default": (i) BUYER commits a breach of any of its representations, duties or obligations arising under this Agreement, (ii) a petition is brought by or against BUYER under any bankruptcy or insolvency laws seeking any reorganization, arrangement, liquidation, dissolution or similar relief with respect to BUYER or BUYER shall make an assignment for the benefit of creditors or if a receiver is appointed for BUYER, or (iii) if, in the opinion of MTG, BUYER's credit has become impaired and BUYER does not, within 5 business days' notice by MTG, deliver credit support in an amount and on terms and conditions reasonably acceptable to MTG.

(b) If a Default has occurred and is continuing, MTG may exercise any or all of the following remedies without notice or leave of court: (i) terminate this Agreement upon two (2) business days' notice, (ii) remove the System(s) from the Consuming Location(s), (iii) disable the

1

Scanned with CamScanner

System(s) to prevent the consumption of Product(s) by BUYER, (iv) cease making deliveries of Product(s) to BUYER, (v) impose new payment terms, including cash on delivery, (vi) bring an action at law or in equity against BUYER, or (vii) exercise any other right or remedy available to MTG.

(c) IF ANY PRODUCT(S) DOES NOT MEET THE SPECIFICATIONS SET FORTH IN THE APPLICABLE EXHIBIT A HERETO, BUYER SHALL NOTIFY MTG AND SHALL BE PERMITTED TO REJECT THE NONCONFORMING PRODUCT(S) ("OFFSPEC PRODUCT"). FAILURE OF BUYER TO GIVE NOTICE TO MTG OF A CLAIM BASED ON OFFSPEC PRODUCT WITHIN FIFTEEN (15) DAYS FROM DELIVERY OF SUCH OFFSPEC PRODUCT SHALL CONSTITUTE AN UNCONDITIONAL WAIVER BY BUYER OF ALL CLAIMS WITH RESPECT TO SUCH OFFSPEC PRODUCT. BUYER'S SOLE AND EXCLUSIVE REMEDY FOR EACH UNEXCUSED FAILURE OF MTG TO DELIVER PRODUCT(S) TO BUYER (I) WHEN REQUESTED BY BUYER, (II) IN THE AMOUNTS REQUESTED BY BUYER, AND/OR (III) DELIVERY OF OFFSPEC PRODUCT, SHALL BE TO OBTAIN, AT NO CHARGE TO BUYER, REPLACEMENT PRODUCT(S) IN AN AMOUNT EQUAL TO SUCH UNDELIVERED PRODUCT FROM MTG.

8. FORCE MAJEURE; ALLOCATION. (a) No failure or omission to carry out or observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim by BUYER against MTG, or be deemed to be a breach of this Agreement if such failure or omission shall be caused by or arise out of a Force Majeure Event. "Force Majeure Event" means any act, event, condition, or occurrence that (i) wholly or partially prevents MTG from performing its obligations under this Agreement, (ii) is beyond the reasonable control of and not the result of negligence of, MTG and (iii) MTG has been unable to overcome by the exercise of due diligence, and to the extent that the foregoing requirements are met, "Force Majeure Event" includes, but shall not be limited to, war, blockade, revolution, insurrection, riot, civil disturbance, sabotage, act of terrorism; a change in law; embargoes or sanctions; closing or accidents to assistances to or adjuncts of the shipping or transportation industry and delay of carriers; inability to obtain power or fuel; machinery breakdown; failure of normal sources of supply, rationing or allocation; action or inaction of any governmental authority; state of emergency; landslide; fire; explosion; flood; hurricane; tornado; earthquake; volcano; lightning strikes; hail storms; tidal waves; unusually severe weather conditions for the location of the Consuming Location, taking into consideration severity, duration and time of year of such conditions; an epidemic or quarantine; acts of god; strikes, labor disputes. (b) If MTG's ability to perform its obligations under this Agreement is affected by a Force Majeure Event, it shall as soon as practicable after it becomes aware of the occurrence of the Force Majeure Event give notice to BUYER of such event and an estimate of the Force Majeure Event's anticipated duration and effect on the performance of its obligations (to the extent such information is available). From and after the date MTG notifies BUYER that it will not be delivering some or all of the Product(s) resulting from a Force Majeure Event until the date that MTG notifies BUYER that the Force Majeure Event, and the repercussions thereof, has concluded and that it will recommence delivery of the Product(s) pursuant to the terms of this Agreement, BUYER shall have the right to acquire such volume of Product(s) (or substitute therefor) that MTG is failing to deliver from any third party. (c) Deliveries of Product(s) hereunder shall be made by MTG from the distribution center(s) normally serving the Consuming Location(s). If sufficient Product(s) from the distribution center(s) becomes unavailable for any reason, including a Force Majeure Event (each a "Product(s) Unavailability"), MTG may, in its sole discretion, apportion any remaining available Product(s) among its various customers, including the BUYER. During any Product(s) Unavailability, other than resulting from a Force Majeure Event, MTG shall also exercise commercially reasonable efforts to obtain replacement Product(s) from other sources within MTG's regular production and distribution center(s) or from other third parties, until such time as the Product(s) Unavailability ceases. MTG shall notify BUYER in writing of any such Product(s) Unavailability and, if applicable, the source and additional costs of any replacement Product(s). BUYER shall, within three (3) business days' receipt of such notice, inform MTG whether it accepts such replacement Product(s) (including the additional costs, if any) or decline such replacement Product(s).

9. INDEMNITY. BUYER AGREES TO INDEMNIFY AND DEFEND MTG AND HOLD IT AND ITS OFFICERS, DIRECTORS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS (INCLUDING, BUT NOT LIMITED TO, ALL COSTS, EXPENSES, LOSSES, DAMAGES, PENALTIES, LIABILITIES AND REASONABLE ATTORNEYS' FEES) INCLUDING FOR DAMAGE OR INJURY TO ANY PERSON AND PROPERTY, ARISING AS A RESULT OF OR OTHERWISE CONNECTED TO BUYER'S ACTS OR OMISSIONS RELATED TO THIS AGREEMENT OR BUYER'S USE OR POSSESSION OF THE PRODUCT(S) AND/OR THE SYSTEM(S).

10. REPRESENTATIONS AND WARRANTIES. (a) MTG warrants that the Product(s) delivered to BUYER shall comply with the specifications set forth in the Exhibit A hereto. MTG MAKES NO OTHER WARRANTY OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, INCLUDING THOSE ARISING UNDER THE UNIFORM COMMERCIAL CODE ("UCC"), EVEN IF MTG IS AWARE OF THE INTENDED PURPOSE OF THE PRODUCT(s), SUCH WARRANTIES BEING HEREBY EXPRESSLY DISCLAIMED. (b) BUYER represents and warrants that, throughout the Term, it has the unrestricted right to enter into this Agreement and to satisfy all obligations hereunder, and it is not obligated to buy any Product(s) for use at the Consuming Location(s) from any third party. BUYER shall indemnify MTG against any and all costs, expenses and damages (including, but not limited to, attorneys' fees) should the foregoing representations be inaccurate. BUYER also represents and warrants that all requisite approvals have been obtained authorizing the execution of and performance under this Agreement.

11. LIMITATIONS OF LIABILITY. (a) BUYER acknowledges that there are hazards associated with the use and storage of the Product(s) and the System(s) and, in furtherance of Section 4(b)(9) of this Agreement, BUYER shall be responsible for warning, training and protecting (as appropriate, including at a minimum those required by applicable laws and regulations) BUYER's employees, officers, agents, customers and any other third party who may be in proximity of and/or exposed to such hazards resulting from BUYER's storage and use of Product(s) and/or System(s). BUYER assumes all risk of loss and liability for damage or injury to any persons and to the property of BUYER or any third party arising out of the delivery, storage and/or use of the Product(s) and/or System(s) whether used singly or in combination with other substances. (b) NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN OR IN ANY OTHER DOCUMENT, IN NO EVENT SHALL MTG BE LIABLE TO BUYER FOR ANY INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE, LIQUIDATED OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS OR BUSINESS OPPORTUNITY OR INTEREST, EVEN IF ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. (c) WAIVER OF CONSUMER RIGHTS: BUYER WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION

Scanned with CamScanner

17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BUYER'S OWN SELECTION, BUYER VOLUNTARILY CONSENTS TO THIS WAIVER. (d) Other than damages resulting from bodily injury caused solely and directly by MTG's gross negligence or willful misconduct, MTG's aggregate liability for any and all damages or losses howsoever occurring, whether based in contract, tort, warranty, strict liability, negligence, equity or any other theory of law shall be limited to and not exceed the payment, if any, received by MTG for the quantity of Product(s) which failed to meet specifications or which was not delivered or service furnished or to be furnished, as the case may be, which is the subject of such claim or dispute, even if a term of the agreement fails of its essential purpose. BUYER agrees that the foregoing exclusion and limitation is a reasonable allocation of risk. No action, regardless of form, arising out of, or in any way connected with the Product(s), System(s) or this Agreement may be brought by BUYER more than ninety (90) days after the cause of action has accrued.

12. DISPUTE RESOLUTION; GOVERNING LAW. (a) If any dispute, controversy or claim arises between the parties out of or relating to this Agreement or any other document executed in connection herewith, or any breach hereof or thereof (each, a "Claim"), then either party may provide written notice thereof to the other, which shall include a detailed description of the Claim. Each party shall promptly designate a senior executive who shall have authority to resolve the Claim through negotiations. The senior executives shall meet within 30 days of the notice to attempt to resolve the Claim. (b) For any Claim that is not resolved by the senior executives within 30 days of commencing discussions, or such longer period as they may agree, the parties hereto irrevocably agree to settle such Claim by binding arbitration. The rules of the American Arbitration Association shall apply. The Claims shall be settled by three arbitrators appointed in accordance with these Rules. The seat of arbitration shall be Dallas, Texas. (c) This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflict of laws principles.

13. MISCELLANEOUS PROVISIONS. (a) If a legal or equitable proceeding is instituted by MTG against BUYER to enforce its rights hereunder and MTG prevails, BUYER shall pay all of MTG's costs and expenses (including attorneys' fees) in connection with such enforcement. (b) This Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and replaces any previously existing agreement or arrangement between them, whether written or oral, prior to the Effective Date. (c) No terms or conditions in any purchase order issued or purportedly issued with respect to the purchase of Product(s) shall vary the terms of this Agreement and any terms and provisions of any purchase order that are contradictory to this Agreement and/or the applicable Exhibit A shall be deemed null and void. No modification or waiver of the terms of this Agreement shall bind BUYER or MTG unless in writing and signed and accepted by a duly authorized representative of both parties. (d) The failure of either party to seek performance by the other of any provision hereof shall in no way affect such party's right to seek performance at a future time and no waiver by either party of a breach of any provision hereof shall be taken or held to be a waiver of any succeeding breach or as a waiver of the provision itself. (e) In the event any provision herein is held to be invalid, unenforceable or illegal by any court or regulatory authority having jurisdiction, that provision shall be severed from the Agreement and the balance of this Agreement shall be construed and enforced as if it did not contain such invalid or unenforceable provision. The parties shall promptly negotiate in good faith to replace such provision by a valid, enforceable or legal provision containing terms as nearly like the severed provision as possible. (f) This Agreement shall inure to the benefit of, and shall be binding upon, the parties and their permitted successors and assigns. MTG may assign this Agreement to any affiliate or subsidiary, without BUYER consent. BUYER shall not assign its rights under this Agreement (whether directly, indirectly by a change of control or by sale of all or substantially all of its assets) without MTG's prior written consent, which consent may be rejected if MTG determines the assignee does not have acceptable credit. (g) The provisions of Sections 9, 11, 12 and 13 shall survive the termination of this Agreement. (h) The terms and conditions of the applicable Exhibit A hereto are incorporated herein by reference. (i) This Agreement may be executed in any number of counterparts, the combination of which shall be construed as the entire executed Agreement. (j) A person who is not a party to this Agreement shall have no right to enforce any of its terms and this Agreement is not intended to give any person other than the parties hereto and their permitted successors and assigns any rights hereunder. (k) Defined terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (v) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein) (w) any reference herein to any Person shall be construed to include such Person's successors and assigns, (x) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (y) all references herein to Sections and Schedules shall be construed to refer to Sections of, and Schedules to, this Agreement, and (z) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

IN WITNESS WHEREOF, MTG and BUYER have caused this Agreement to be executed by their respective duly authorized representatives as of the Effective Date following review of the terms and conditions by their respective legal representatives or (as applicable) waiver of legal review.

| GB Sciences Louisiana, LLC / Good Day Farms | MATHESON TRI-GAS, INC. |
|---|---|
| Signature: | Signature: |
| Printed Name: Spencer Hennessy | Printed Name: |
| Title: National Director Supply Chain | Title: |
| Date: 9/14/23 | Date: |

Scanned with CamScanner



**MATHESON**
The Gas Professionals

## AMENDMENT 1 TO PRODUCT SUPPLY AGREEMENT - BULK

This Amendment 1 (the "Amendment") to the Product Supply Agreement – Bulk with an Effective Date of 8/22/2023 ("Agreement") is entered into by and between Matheson Tri-Gas, Inc. ("MTG") and GB Sciences Louisiana, LLC / Good Day Farm ("BUYER") hereby amends the Agreement effective as of 9/12/2023. Capitalized terms used in this Amendment that are not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

1.  MTG and Buyer agree to the following changes to the Agreement

    A.) 2.TERM. Delete sentence 3 in it's entirety and replace with – "This Agreement shall automatically renew for successive terms equal in length to the Initial Term (each a "Renewal Term"), unless notice of termination is received by either party not less than twelve (12) months (a) prior to the expiration of the Initial Term or each successive Renewal Term or (b) from the effective date of any amendment to this Agreement or any Exhibit A hereto."

    B.) This Agreement is subject to the renewal of the Agreement for Services dated September 14, 2017, between the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College on behalf of the Louisiana State University Agricultural Center and Buyer. If the Agreement for Services is not renewed, this Agreement shall terminate immediately upon the expiration of the Agreement for Services. Additionally, in the event of a change in state or federal law, regulation, or enforcement that materially and adversely affects the business operation of Buyer or the subject matter of this Agreement, either party may elect to terminate this Agreement by providing the other party at least (90) days advance written notice of termination.

2.  Except as expressly amended hereby, all other terms and conditions of the Agreement and the Packaged Gas Rider (if applicable) shall remain in full force and effect as originally written. This Amendment shall be governed by and construed in accordance with the laws of the State of Texas.

IN WITNESS WHEREOF, MTG and BUYER have caused this Amendment to be executed by their respective duly authorized representatives as of the date stated above.

| GB Sciences Louisiana, LLC / Good Day Farm | MATHESON TRI-GAS, INC. |
|---|---|
| Signature: | Signature: |
| Printed Name: Spencer Hennessy | Printed Name: |
| Title: National Director Supply Chain | Title: |
| Date: 9/14/23 | Date: |

Scanned with CamScanner

## EXHIBIT A-1 TO PRODUCT SUPPLY AGREEMENT -- BULK

This Exhibit A-1 to the Product Supply Agreement -- Bulk ("Exhibit A-1") is incorporated into and made a part of that certain Product Supply Agreement -- Bulk effective 8/22/2023 ("Agreement") by and between Matheson Tri-Gas, Inc. ("MTG") and GB Sciences Louisiana, LLC / Good Day Farms ("BUYER"). In the event of any conflict between the terms and conditions of this Exhibit A-1 and the Agreement, the terms and conditions of this Exhibit A-1 shall prevail. All capitalized terms used herein and not otherwise defined shall bear the meanings assigned to them in the Agreement.

| | |
|---|---|
| 1. Effective Date of Exhibit A-1 | First Fill of Product |
| 2. Initial Term | 60 Months |
| 3. Consuming Location | 600 Franke Drive Ruston, LA 71270 |
| a. Product(s) | Carbon Dioxide |
| (i) Specifications of Product(s) | Industrial Grade, Bulk, Liquid, Carbon Dioxide |
| (ii) Estimated Monthly Volume ("MMPA") | 20 Tons |
| (iii) Product Price (UOM) | $ 0.12 / LB. |
| b. System | 14 ton bulk vessel and related equipment |
| c. Monthly Service Charge / Month | $950.00 |
| d. Installation Cost | $0.00 |
| e. Telemetry / Month | Yes ☒  No ☐  Monthly Charge $ 100.00 |
| f. Annual Inspection Fee | $0.00 |
| g. Surcharge | $0.00 |
| h. Delivery | $75.00 |
| i. Safety and Compliance Charge | $0.00 |
| j. Customer-owned bulk storage system will be used | Yes ☐  No ☒ |
| (i) Maintenance charge | $0.00 on rented equipment |
| 4. Other | |

NOTE: All other pricing for Products, Systems and other related costs and services not otherwise specified above shall be subject to MTG's then current pricing for similarly situated customers.

In accordance with Section 6 of the Agreement, all notices shall be sent to the following addresses (as applicable):

| | |
|---|---|
| Signature: *[signature]* | Signature: |
| GB Sciences Louisiana, LLC / Good Day Farms | Matheson Tri-Gas, Inc. |
| Attn:  Spencer Hennessy | Attn: Product Management |
| 600 Franke Drive | 909 Lake Carolyn Parkway; Suite 1300 |
| Ruston, LA 71270 | Irving, TX 75039 |
| Email:  SHENNESSY @ GOODDAYFARM.com | Email: BulkContractAdmin@mathesongas.com |
| Date:  9/14/23 | Date: |

Scanned with CamScanner



**Airgas.**
an Air Liquide company

Airgas USA, LLC
31 N. Peoria Ave.
Tulsa, OK 74120
http://www.airgas.com

October 5, 2023

**VIA UPS OVERNIGHT DELIVERY**

GB Sciences Louisiana, LLC
Mr. Anthony Cieslak
425 West Capitol Ave, 14th Floor
Little Rock, AR 72201
Attn:    Legal Counsel

Re:  **GB Sciences Louisiana LLC Indoor Farming and Biomass Extraction Product Sale Agreement with Effective Date May 1, 2019**

Dear Mr. Cieslak:

I am the Area Vice President with Airgas USA, LLC ("Airgas").  As you should be aware, there is a current Indoor Farming and Biomass Extraction Product Sale Agreement (the "Agreement") in place between Airgas and GB Sciences Louisiana LLC ("Company") for the sale by Airgas and purchase by Company of industrial, specialty, and/or medical gases ("Product").

The Agreement requires that Company purchase all of its present and future requirements of Product from Airgas during the term of the Agreement.  The Agreement has a seven (7) year initial term, followed by additional seven (7) year terms.  Absent twelve (12) months' prior written notice by Company to Airgas at the end of the initial term or any subsequent term of Company's intent to terminate the Agreement, it remains in full force and effect.

Company has attempted to terminate this Agreement pursuant to Section 2 (Term), which states that "[I]n the event of any change in state or federal law, regulation, or enforcement that materially and adversely affects the business operations of Buyer or the subject matter of this Agreement, either party may elect to terminate this Agreement by providing the other party with at least thirty (30) days' advance written notice of termination."

Per letter dated September 11, 2023, Company has purported to provide "evidence" of how various changes in state or federal law and regulations have materially and adversely affected its business operations and "economic bottom line" and have "exhausted [] options to mitigates the damage caused by the changes in law."

It has come to Airgas's attention, however, that GB still has a need for Product at the Ruston facility and is currently using an alternative supplier. It is Airgas' intention to continue to provide Product pursuant to the Agreement. Please note that Company's failure to adhere to the terms and conditions of the Agreement requiring it to purchase all of its Product requirements from Airgas constitutes a material breach of contract and must be stopped immediately.  We trust this will resolve the matter.  However, if you have any questions with regard to Company's continuing legal obligations, you may wish to consult your own legal counsel.  Airgas reserves all of its rights and remedies under the Agreement, at law and in equity.

We look forward to hearing from you with regard to the next scheduled Product delivery, consistent with your contractual obligations. You may contact me directly at 903-838-8516 or Wade.Gray@airgas.com.

**Ex. 6 - Airgas Response**

October 5, 2023
Page 2

Sincerely yours,

Wade Gray
Area Vice President, Mid South Region

cc:     Susan Durbin, District Manager (via e-mail)

Ex. 6 - Airgas Response